Annie Lee HUDSON, K. Celeste Campbell, Estherlene Holmes, Edna Rose McCoy, Dr. Debra Ann Petitan, Walter A. Sherrill, and Beverly F. Underwood, Plaintiffs,

v.

The CHICAGO TEACHERS UNION, LOCAL NO. 1; Robert M. Healey, Jacqueline B. Vaughn, Rochelle D. Hart, Thomas H. Reece, Glendis Hambrick, individually and as officers of the Chicago Teachers Union; the Board of Education of the City of Chicago, Illinois; Raoul Villalobos, Martha Jantho, Thomas Corcoran, Betty Bonow, Sol Brandzel, Clark Burrus, Leon Jackson, Rose Mary Janus, Dr. Wilfred Reid, Myrna Salazar, Dr. Luis Salces, Viola Thomas, individually and as officers and members of the Board of Education for the City of Chicago, Illinois, Defendants.

No. 83 C 2619.

United States District Court, N.D. Illinois, E.D.

Nov. 3, 1983.

Louis Bulkeley, John V. Ryan, Margaret Garvey, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., Joseph J. Hahn, Nat. Right to Work Legal Defense Foundation, Inc., Springfield, Va., for plaintiffs.

Joseph M. Jacobs, Charles Orlove, Stephen Horwitz, Jacobs, Burns, Sugarman & Orlove, Wayne Giampietro, Lawrence Poltrock, DeJong, Poltrock & Giampietro, Chicago, Ill., for CTU and defendants Healey, Vaughn, Hart, Reece, and Hambrick.

Robert Wolf, John Wren, Patricia Whitten, Law Div., Bd. of Educ., Thomas Brown, Chicago, Ill., for Bd. and defendants Villalobos, Jantho, Corcoran, Bonow, Brandzel, Burrus, Jackson, Janus, Reid, Salazar, Salces, and Thomas.

## ORDER

BUA, District Judge.

This matter comes before the Court upon a complaint accompanied by a motion for a preliminary injunction. Plaintiffs are employees of the Board of Education of the City of Chicago (the "Board") who are not members of the Chicago Teachers Union ("CTU"). Named as defendants are the Board, the twelve members of the Board individually and as officers and members, and the CTU.

Plaintiffs' complaint is in seven counts, challenging the constitutionality of Ill.Rev. Stat. ch. 122 ¶ 10–22.40a (1981) on its face and as applied, under both the United States Constitution and the Constitution of Illinois. Plaintiffs claim violations of their civil rights under Title 42 U.S.C. §§ 1983 and 1988, seeking damages and invoking this Court's equitable powers under 28 U.S.C. §§ 1331 and 1343 for injunctive and declaratory relief. The suit is brought on behalf of plaintiffs and on behalf of all those similarly situated as employees of the Board of Education of the City of Chicago who are not members of the Chicago Teachers Union. A motion to maintain a class action and for certification of the class was filed on May 19, 1983.

The Court set May 26, 1983 for hearing on the motion for a preliminary injunction. Subsequently, the parties agreed to advance the matter for a full trial on the merits pursuant to Rule 65(a)(2) F.R.C.P. The presentation of testimony and evidence proceeded accordingly. Based upon its review of the evidence presented at trial and the parties' pretrial and post trial briefs, the Court enters the following findings of fact and conclusions of law.

1. To the extent that any of the findings of fact included herein are deemed to be conclusions of law, they are hereby adopted as conclusions of law. To the extent that any of the conclusions of law included herein are deemed to be findings of fact, they are hereby adopted as findings of fact.

2. The bargaining unit includes: all full-time teachers, assistant principals, truant officers,

## FINDINGS OF FACT [1]

### I. *Background*

Since 1967, the Chicago Teachers Union ("CTU") has served as the exclusive bargaining representative to the Board of Education of the City of Chicago (the "Board") on behalf of the approximately 27,500 persons who are included within the bargaining unit of Board employees.[2] Membership in CTU is voluntary; all but five percent of all employees in the bargaining unit are union members. All employees, however, whether or not members of the union, are fully covered by the terms of the collective bargaining agreement between CTU and the Board. Until December, 1982, the entire cost of collective bargaining and contract administration was underwritten by CTU members through their union dues. Thus, those teachers and other employees within the bargaining unit who chose not to join CTU received the benefits of CTU's collective bargaining efforts without contributing financially to the costs of such efforts.

For several years, CTU had attempted without success to negotiate a "fair share fee" clause into its labor contracts with the Board.[3] The major obstacle was the absence of any language in the Illinois School Code, Ill.Rev.Stat. ch. 122 ¶ 1–1 *et seq.* (1981), enabling the Board to agree to such a clause. Effective August 1, 1981, the Illinois Legislature enacted a statute providing as follows:

*Non-member proportionate share payments in lieu of dues.*

Where a collective bargaining agreement is entered into with an employee representative organization, the school board may include in the agreement a provision requiring employees covered by the

school library assistants, hearing testers, vision testers, school clerks, teachers' aides, and school community representatives employed by the Board.

3. A "fair share fee," alternately known as a "proportionate share," "agency," or "representation" fee, requires essentially that non-union employees pay a share of the union's costs of collective bargaining.

agreement who are not members of the representative organization to pay their proportionate share of the cost of the collective bargaining process and contract administration, measured by the amount of dues uniformly required by members. In such case, proportionate share payments shall be deducted by the board from the earnings of the non-member employees and paid to the representative organization.

(Ill.Rev.Stat. ch. 122 ¶ 10–22.40a) (1981).

Acting under the newly granted authority of ¶ 10–22.40a, the Board agreed to the inclusion of a "fair share fee" clause in the next collective bargaining agreement with CTU. The clause was contained in Article 1, Section 8.2 of the one-year collective bargaining agreement between CTU and the Board, effective September 1, 1982, which read as follows:

> 1–8.2. All full-time employees covered by this Agreement who are not members of the UNION shall, commencing sixty (60) days after their employment or the effective date of the Agreement, whichever is later, and continuing during the term of this Agreement, and so long as they remain non-members of the UNION, pay to the UNION each month their proportionate share of the cost of the collective bargaining process and contract administration measured by the amount of dues uniformly required by members of the UNION. Such proportionate share payments shall be deducted by the BOARD from the earnings of the non-member full-time employees and paid to the UNION. The UNION shall submit to the BOARD an affidavit which specifies the amount which constitutes said proportionate share which shall not exceed the dues uniformly required of members of the UNION.
>
> The UNION shall indemnify and hold harmless the Board of Education, its members, officers, agents and employees from and against any and all claims, demands, actions, complaints, suits, or other forms of liability that shall arise out of or by reason of action taken by the BOARD for the purposes of complying with the above provisions of this Article, or in reliance on any list, notice, certification, affidavit or assignment furnished under any of such provisions.

Shortly after CTU and the Board signed the new agreement, CTU amended its constitution and by-laws to authorize the CTU to determine the amount of the fair share fee, receive and consider objections thereto, and set up a hearing procedure for non-members who objected to deductions. Accordingly, CTU adopted a hearing and appeal procedure known as the "CTU Implementation Program." Under the procedure, any non-member could object to any expenditure by CTU of his or her fair share fee payroll deductions for activities or causes which were political or ideological and not germane to the collective bargaining process or contract administration. The objector was required to individually notify the president of CTU of his or her objection by registered mail within 30 days after the first payroll deduction. The objection would be considered by CTU's Executive Committee, and the objector would be notified within 30 days of any decision as to a reduction in the amount of the payroll deduction. The objector could appeal within another 30 days, and receive a personal hearing before the CTU Executive Board. If still unsatisfied, the objector could invoke a determination by an impartial arbitrator to be appointed by the CTU president from a list maintained by the Illinois State Board of Education of accredited arbitrators. CTU was to bear the cost of such a proceeding. A determination favorable to the objector would result in an immediate reduction in the amount of deductions for all non-union members and a rebate to the objector. Provision was also made for consolidating proceedings in the case of multiple objectors.

The CTU Implementation Program was designed to become available only after the first fair share fee deduction. Non-members were not provided any right or opportunity to challenge CTU's initial request to the Board or the basis on which the deduction was calculated, nor were non-members given the right or opportunity to challenge

the deduction prior to the time the deduction was actually made.

The CTU determined the amount of the fair share fee based on its account ledgers and other records for the year beginning July 1, 1981 and ending June 30, 1982. Calculations were made by the assistant office manager, with the assistance of counsel and the financial secretary of CTU. The CTU estimated that a total of $188,549.82 in expenditures was unrelated to the costs of collective bargaining and contract administration. Based upon its financial statements, CTU calculated its income for the year at $4,103,701.58. As a result, CTU determined that the fair share fee for the contract year 1982–83 should be 95 percent of union dues, based on the calculation that $188,549.82 divided by $4,103,701.58 equals approximately five percent.[4] Current CTU dues were at that time $17.35 per month for ten months for teachers and $12.15 per month for ten months for "career service employees."[5] Accordingly, the amount to be deducted each month for ten months would be $16.48 from non-union teachers' paychecks and $11.54 from non-union career service employees.

In October, 1982, CTU requested the Board to begin making deductions. The request was accompanied by an affidavit signed by CTU President Robert Healey, which specified the amount of the fair share fee, briefly explained how the figure had been calculated, and stated that a hearing procedure was available to non-union members who wished to object to the deductions.

The Board did not review any of the documents or calculations used by CTU in determining the fair share fee, nor did it challenge any of the information in the affidavit. In December, 1982, the Board began deducting the fair share fee from non-member employees' paychecks. At no time did the Board ask for the consent of the non-member employees to the deductions, explain the basis for the determination of the amount deducted, or inform them of the rebate and appeal procedure set up by CTU.

CTU, for its part, asked its member delegates at all schools to distribute flyers, display posters, generally inform non-members of the pending deductions, and invite non-members to enroll in CTU, with amnesty for past imposed fines. The CTU Implementation Program was published in the December, 1982, issue of the union newspaper which was widely circulated to non-members.

## II. *Plaintiffs' Responses to Fair Share Fee Deductions*

Each plaintiff is a member of the bargaining unit represented by CTU, but none is a member of CTU. Six of the seven plaintiffs have had fair share fee deductions made from their paychecks.[6] Of these six, it is stipulated that two never made any objection to the deductions to either the Board or to CTU.[7] It is further stipulated that all of the remaining four plaintiffs submitted letters of protest to CTU. Plaintiffs Hudson, Campbell and Sherrill sent identically worded letters, stating in substance that they believed that CTU was using part of their salary for purposes unrelated to collective bargaining with the Board, specifically protesting and objecting to such expenditures, and demanding that payroll deductions be reduced to only the pro rata amount necessary for collective bargaining, contract administration, and grievance adjustment with the Board. The fourth plaintiff, Beverley Underwood, also wrote to CTU. Underwood's letter, however, differed from the other

---

**4.** The precise percentage was 4.5946 percent. By rounding off this figure to 5 percent, CTU gave up approximately $16,636 in favor of non-members, which amount, it reasoned, could provide a "cushion" to cover any inadvertent mathematical or typographical errors.

**5.** Union members had the option of prepaying this amount in a lump sum of $173.50 or $121.50, depending on their classification, or spreading payments over the year. Roughly 91 percent of union members chose the latter.

**6.** For some unknown reason, plaintiff Edna Rose McCoy has never had an agency fee deducted from her paycheck.

**7.** Plaintiffs Estherlene Holmes and Dr. Debra Ann Petitan.

three identical letters. Underwood wrote that she was "objecting to the unauthorized deduction by CTU of *any* money from [her] paycheck." She requested the president of CTU to consider her objection "and return *all* payroll deductions." The letters sent by Campbell and Sherrill were sent on November 19, 1982, before the CTU implementation program had been publicized. Underwood and Hudson, did not send their letters until after the first payroll deduction had been made and after the objection-rebate procedure had been publicized.

CTU answered all four letters individually with identical form letters which acknowledged receipt of plaintiffs' letter requesting a reduction in fees, briefly explained the process by which the fair share fee had been calculated, and concluded, "as a result, you will note that the Chicago Teachers Union has, in fact, reduced the amount of the fees to be deducted from your earnings ... as you have requested in your letter." The letter stated that an appeal procedure had been established and enclosed a copy of the Implementation Plan. The CTU letter closed, "any objection you may file will be recognized and processed in full compliance" therewith.

None of the four letters sent by plaintiffs was ever submitted to the Executive Committee of CTU or otherwise reviewed pursuant to the Implementation Plan. Neither the financial secretary nor the president of CTU considered any of the four letters as amounting to the type of written objection sufficient to trigger the objection-rebate procedure. The form letter sent by CTU was intended to make sure that all those who wrote concerning deductions would have a copy of the Implementation Plan, be apprised of their right to object, and be afforded the opportunity to do so.

Upon receiving the CTU letter, three of the protesting plaintiffs took no further action. Sherrill took no further steps because he objected to the requirement that he submit to the objection-rebate procedure. Campbell had no further contact with CTU because she did not feel anything would come of it. Underwood testified that she believed her letter had triggered the appeal process, and consequently she

did nothing more, anticipating that CTU would be contacting her to set a hearing date.

Plaintiff Hudson, however, wrote a second letter to CTU in reply to CTU's answer to her original letter. In the second letter, Hudson stated, "I would like a full disclosure of the Union's financial operations and a step-by-step explanation of how the non-member portion of the dues was gotten." CTU responded by letter to Hudson's second letter by reiterating the gist of CTU's first letter and inviting Hudson to make an appointment at the CTU office for an "informational conference" and/or to inspect the roster of CTU expenditures. The letter concluded, "After such conference, if you continue to object to any expenditures, you may submit your protest to the Executive Committee ... which will then review your objections and issue its determination." Plaintiff Hudson took no further action with respect to CTU. She testified that she thought it was unreasonable for CTU to ask her to take the trouble to go to the union office when CTU could have sent her the requested information. Furthermore, she did not consider the "informational conference" to be part of the Implementation Plan, but rather that CTU was "just giving [her] the runaround to make more trouble so that [she] would drop it."

Plaintiffs contend first that all seven plaintiffs have objected and continue to object to some portion of the fair share fee deducted from their paychecks. Second, plaintiffs contend that CTU never notified any plaintiff of any determination concerning his or her objections, nor did it inform any plaintiff that his or her letter failed to satisfy the Implementation Plan so as to trigger the review procedure. Defendants' answer that none of the plaintiffs registered objections as defined in the Implementation Plan, that the review process was, therefore, never triggered, and that CTU clearly so notified plaintiffs by letter.

This Court finds that plaintiffs McCoy, Holmes, and Petitan clearly registered no objection to payroll deductions other than

by filing this suit long after the 30-day objection period had expired. The letters sent by plaintiffs Holmes and Sherrill could not reasonably be viewed as objections within the definition of the Implementation Plan. A properly submitted objection, according to the Plan, had to be made "within 30 days *after* the first salary payment" by a "non-member employee *making* such payments" (emphasis added). Both Holmes and Sherrill sent their letters of protest on November 19, *before* any deductions had been made. CTU was fully justified in interpreting the two identically worded letters as insufficient to trigger the review process. The form letter which CTU sent back to Holmes and Sherrill, accompanied by the Implementation Plan, was a conscientious attempt to warn the two plaintiffs that their letters had not triggered the review process coupled with explicit instructions on how to raise a proper objection. If Holmes or Sherrill initially believed that they had registered a formal objection, such belief was clearly no longer reasonable after receiving CTU's response. The failure of these two plaintiffs to further pursue their protest within 30 days after the first deduction negates their contention that they had objected and continued to do so.

The Court further finds that plaintiffs Hudson and Underwood both substantially complied with the requirements of the Implementation Plan in submitting written complaints. Plaintiff Underwood sent her letter of objection *after* her first payroll deduction, specifically characterized her protest as an "objection," requested that the president of CTU consider it, and demanded a rebate. It was unreasonable on the part of CTU to view Underwood's communication as anything other than a formal objection.[8] In this context, the same form letter as sent by CTU to Holmes and Sherrill took on a different meaning. Plaintiff Underwood could reasonably interpret CTU's letter to mean that she had, in fact, complied with the procedure by filing a proper complaint. It was reasonable for

her to await further communication from CTU and to take no further steps. Hence, the Court finds that plaintiff Underwood's objection is still pending.

For essentially the same reasons, the Court finds that plaintiff Hudson filed a proper objection, and that her objection is still pending. That the first exchange of correspondence between Hudson and CTU was identical to that between Sherrill, Holmes and CTU is of no real import, because in the case of Hudson, the exchange took place *after*, not before, the first payroll deduction. While it is true that Hudson's second letter, wherein she asks for a full disclosure of expenditures, is not a complaint, there was no need that it be construed as one: She had already registered a proper complaint, received from CTU what she reasonably considered a confirmation of that fact, and was now making a related but separate request. That she chose not to pursue her request in no way nullifies her earlier complaint. The most that could be said for CTU is that Hudson, in failing to respond to CTU's second letter, was uncooperative. Hudson was not necessarily unjustified in believing that she was getting the "runaround" from CTU.

### III. *The Fair Share Calculation*

Plaintiffs also challenge CTU's calculations of the 1982–83 fair share fee as incomplete and inaccurate, and itemize approximately $110,000 worth of union expenditures which, they claim, are unrelated to collective bargaining with the Board, and which should be deducted from the fair share fee. The Court need not consider in detail the two dozen disputed items, which would at most change the non-compensable expenditures from 4.5946 percent to 7.2751 percent of union dues. Nor need it rule on what portion, if any, of the $2,167,000 of payments by CTU to affiliated state and national labor organizations, is unrelated to collective bargaining expenses between CTU and the Board. Likewise, the Court may pass over plaintiffs' challenges to ex-

---

8. That Underwood demanded the return of *all* rather than some of her deductions is immaterial. The Court is dealing here with a rebate procedure for school teachers, not elaborate trial pleadings involving skilled attorneys.

penditures for the union newspaper and for certain salaries, which are claimed to further only in small part, CTU's collective bargaining efforts. For reasons discussed below, the Court agrees with defendants that these matters should be deferred to the internal rebate procedure established by the Implementation Plan established for the very purpose of reviewing the union's calculations and determining if a rebate is due. Plaintiffs Hudson and Underwood, having filed valid objections still pending under the Implementation Plan, and equipped with the facts and figures obtained during discovery, are in an excellent position to work out their challenges with CTU under the impartial arbitrator provided for in the Implementation Plan. Should arbitration prove unsatisfactory, plaintiffs would be free, of course, to avail themselves of any available relief in the courts.

## CONCLUSIONS OF LAW

The Court finds, and the parties do not dispute, that it has jurisdiction of this case under 28 U.S.C. §§ 1331, 1343 and 2201.

### I. *Constitutionality of the Statute on Its Face*

This case presents essentially six issues for resolution.[9] The first of these is plaintiffs' constitutional challenge to Ill.Rev. Stat. ch. 122 ¶ 10–22.40a (1981), which is claimed to be unconstitutional on its face. Plaintiffs claim that the statute violates their First Amendment rights of freedom of association, and their Fourteenth Amendment rights to procedural due process and equal protection.

Both plaintiffs and defendants correctly note that *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), is the starting point for analysis. In *Abood*, the Detroit Board of Education entered into an exclusive bar-

gaining agreement with the Detroit Federation of Teachers. Among the terms of that agreement was one which required every employee represented by the union— even if not a union member—to pay to the union as a condition of employment a "service fee" equal in amount to union dues. The Board had agreed to this clause under authority granted by a Michigan statute. Non-union members claimed that this "agency shop" provision violated their First Amendment associational rights. The Court recognized that such provisions did affect freedom of association, noting that:

> To compel employees financially to support their collective bargaining representative has an impact on their First Amendment interests ... To be required to help finance the union as a collective bargaining unit might well be thought ... to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit.

431 U.S. at 222, 97 S.Ct. at 1793.

At the same time, the Court found "important government interests" which "presumptively support the impingement upon associational freedom created by the agency shop here at issue." *Id.* at 225, 97 S.Ct. at 1794. The dual interests of the government were first, maintaining labor peace and second, eliminating the risk of "free riders" such as workers who enjoyed improved working conditions without contributing to the costs of achieving them. *Id.* at 224, 97 S.Ct. at 1794.

In *Abood*, the Court balanced the competing interests as follows: "insofar as the service charge is used to finance expenditures by the union for the purposes of collective bargaining, contract administration, and grievance adjustment," precedent

---

**9.** In their initial complaint and motion for preliminary injunction, plaintiffs claimed that the statute and the CTU Implementation Plan violate the Illinois Constitution. In light of plaintiffs' subsequent failure to cite any authority or pursue any argument to the contrary, the Court reads the relevant clauses of the Illinois Constitution as co-extensive with the First and Fourteenth Amendments of the U.S. Constitution. *See, e.g., In Re Air Crash Disaster Near Chicago,*

*Ill., etc.,* 644 F.2d 594 (7th Cir.1981); *Friedman and Rochester Ltd. v. Walsh,* 67 Ill.2d 413, 10 Ill.Dec. 559, 367 N.E.2d 1325 (1977); *Knight v. Bd. of Education of Tri-Point Community Unit School District No. 6J,* 38 Ill.App.3d 603, 348 N.E.2d 299 (1976); Constitutional Commentary to Ill. Const. art. I § 2 (Smith-Hurd 1981). Hence the Court's holdings with respect to the federal constitutional issues subsume any parallel state constitutional issues.

"appears to require validation of the agency-shop agreement before us." *Id.* at 225–26, 97 S.Ct. at 1794. Where, however, non-members are forced to pay more, they "may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative." *Id.* at 234, 97 S.Ct. at 1799.

■ Turning to the case at bar, this Court holds that Ill.Rev.Stat. ch. 122, ¶ 10–22.40a (1981), passes constitutional muster under *Abood.* First, it empowers the Board to agree to no more than that which the Supreme Court expressly approved in *Abood.* The grant of authority in the statute limits the Board's power to agree only to a fair share fee that is the non-union members' "proportionate share of the cost of the collective bargaining process and contract administration, measured by the amount of dues uniformly required of members." The express legislative mandate is that the Board may take no action that would infringe on a non-member's fundamental First Amendment rights.

■ Second, the statute, on its face, does not violate plaintiffs' procedural due process rights. To be sure, the statute is silent on how the fee is to be calculated and by whom, the precise mechanism for payroll deductions, and the procedure available to non-members to obtain impartial review of the fair share fee determination or deduction. But the statute's failure to address these issues does not render it unconstitutional on its face. In attacking the facial validity of a state statute on constitutional grounds, it is well settled that the challenger must overcome a strong presumption of legislative validity. *Williams v. General Foods Corp.,* 492 F.2d 399 (7th Cir.1974). When a statute is reasonably capable of a construction compatible with the Constitution, the courts are required to so construe it. *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981).

This Court cannot construe the statute's silence as precluding a fair and accessible process for determining the amount of the fair share fee or the means to redress any grievances by non-members. It is far more reasonable to assume that the Illinois Legislature saw fit to leave to the school boards and their exclusive bargaining representatives the working out of the administrative details in full compliance with the statute in their individual contracts. That the legislature could have provided more specific procedural guidelines, as have the legislatures in some other states,[10] does not invalidate the approach taken here. Apparently, the Illinois lawmakers opted to give flexibility and a maximum of freedom to the contracting parties in developing their fair share fee deduction systems, contemplating that the due process and equal protection concerns of individual non-members would receive adequate attention from the local school boards, which are public bodies and creatures of the legislature.

Statutes similar to that in Illinois have withstood constitutional challenge. The challenged statute in *Abood,* for example, was silent on the question of procedural due process.[11] This did not, however, prevent the U.S. Supreme Court from finding the statute constitutional on its face. Likewise, in Minnesota, the Minnesota Supreme Court upheld the constitutionality of the 1973 version of the state's fair share fee statute that contained no mention of any procedural due process safeguards.[12] *Robbinsdale Education Association v. Robbinsdale Federation of Teachers,* 307 Minn. 96, 239 N.W.2d 437 (1976) vacated and remanded, 429 U.S. 880, 97 S.Ct. 225, 50 L.Ed.2d 160 (1976), *aff'd sub nom. Threlkeld v. Robbinsdale Federation of Teachers,* 316 N.W.2d 551 (Minn.1982), *app. dismissed,* — U.S. —, 103 S.Ct. at 24, 74 L.Ed.2d 40 (1982). Finally, in *Association of Capitol Powerhouse Engineers*

---

10. See note 13, *infra.*

11. Michigan Comp. Laws § 423.210(1)(c) (1973).

12. Minnesota Stat. 179.65 subd. 2 (1973).

.*v. Washington*, 89 Wash.2d 177, 570 P.2d 1042 (1977), the Washington Supreme Court upheld the constitutionality of a statute which made no specific mention of procedural safeguards for non-member employees objecting to fair share fees. These precedents lend support to this Court's determination that on its face, Ill.Rev.Stat. ch. 122 ¶ 10–22.40a (1981), does not violate plaintiffs' due process rights.

■ Plaintiffs' third facial challenge to the statute is an equal protection challenge. In essence, plaintiffs argue that union members and non-members are treated differently under the law solely on the basis of their exercise of their First Amendment rights. The claimed impermissible distinction is twofold: first, union members are empowered by virtue of their membership, to determine through their votes the amount to be spent by their officials on contract negotiations and administration, whereas non-members are prohibited from so participating. Second, the statute requires the Board to automatically deduct fair share fees from non-members' salaries but not from the salaries of union members.

The first contention is without merit. The right to vote on internal union affairs is not extended or withheld by the state, but rather is the natural consequence of union membership. If non-members wish to participate in the decision-making process, they have only to join the union. This is, however, precisely what plaintiffs do not want to do. Short of disenfranchising union members or giving non-members voting rights, there is no way the Court can protect plaintiffs from the logical and inevitable consequences of a choice which they knowingly and voluntarily made. A challenge similar to that raised here was rejected by this Court in *Afro-American Police League v. Fraternal Order of Police*, 553 F.Supp. 664 (N.D.Ill.1982). There, plaintiffs complained, *inter alia*, that as non-FOP members, they were not entitled to vote on the collective bargaining agreement. This Court held that there was no duty imposed on the union requiring it to allow non-members to vote on the contract. "The only obligation owed such non-members by the union is the duty of fair representation. That duty is not violated by the mere failure of the union to allow the non-members to vote on the contract." 553 F.Supp. at 668.

The second leg of plaintiffs' equal protection challenge is based on an erroneous version of the facts, and can thus be disposed of quickly. While the statute speaks only to deductions from non-members' salaries for collective bargaining expenses, union members are under no less compulsion to pay than are non-members. They may, it is true, pay union dues in a lump sum in advance, or they may pay a prorated share of their dues on a monthly basis by authorizing the Board to make payroll deductions. The only option not available to non-members is the relatively unattractive one of paying the entire fair share fee upfront.[13] It is ironic that plaintiffs, who mount basic objections to the amount of fair share fees and the allegedly preemptory method in which they are collected, are also heard to complain that they are being deprived of the right to pay the contested fee in advance in a lump sum.

To conclude, the statute classifies not on the basis of exercise of First Amendment rights, as plaintiffs would argue, but rather on the basis of the payment or non-payment of the costs of collective bargaining, the benefits of which are received by all. The law does no more than assure that all those similarly situated—employees benefiting from improved conditions of employment—be treated in the *same* fashion—by being required to pay a proportionate share for the benefits received.

## II. *Constitutionality of the Statute as Applied*

The second major issue raised by plaintiffs is that the Illinois statute is unconstitutional *as applied*. Plaintiffs maintain that the administrative scheme agreed upon by the Board and CTU in Article 1 § 8.2 of the collective bargaining agreement and further embodied in the "CTU

---

**13.** The Court notes that an overwhelming number of union members have rejected this option.

Implementation Plan" violates the First and Fourteenth Amendments. Plaintiffs' brief identifies several specific aspects of the administrative arrangements which they find objectionable.[14] These various alleged infirmities appear to focus on different aspects of the same underlying argument:

1) The CTU Implementation Plan violates non-members' First Amendment rights because it is designed and controlled by CTU and it is administratively cumbersome.

2) Even if the CTU procedure is not cumbersome, any type of rebate procedure is *per se* violative of the First Amendment because it permits use of non-members' funds for purposes condemned by *Abood* —even if only on a temporary basis.

3) The "CTU Implementation Plan" violates non-members' procedural due process rights.

In *Perry v. International Ass'n. of Machinists Local Lodge 2569*, 708 F.2d 1258 (7th Cir.1983), the Court of Appeals for this Circuit noted the variety of arrangements among the states for handling non-members' objections to fair share fees. The Seventh Circuit, without itself taking a position on the issue, recognized a split among the courts on whether a rebate procedure is a constitutionally sufficient safeguard for a potential violation of the First Amendment. 708 F.2d at 1261. Some courts have found rebate procedures sufficient to protect an employee's rights. *See, e.g., Ellis v. Brotherhood of Railway, Airline & Steamship Clerks*, 685 F.2d 1065, 1070 (9th Cir.1982); *Browne v. Milwaukee Board of School Directors*, 83 Wis.2d 316, 265 N.W.2d 559 (1978); *White Cloud Education Ass'n v. Board of Education*, 101 Mich.App. 309, 300 N.W.2d 551 (1980). Other courts have held that an agency fee system requiring continual payments and subsequent refunds to claimants does not satisfy the requirements of the First Amendment. *See, e.g., Robinson v. State*

*of New Jersey*, 547 F.Supp. 1297, 1321 (D.N.J.1982); *School Committee of Greenfield v. Greenfield Education Association*, 385 Mass. 70, 431 N.E.2d 180 (1982).

Analysis of the CTU rebate procedure must proceed in light of the Seventh Circuit's opinion in *Perry v. I.A.M., supra*. There, the Court noted that, whether or not a rebate procedure is *per se* constitutional, "all courts have agreed that, at least, a rebate system must be fair, administered in good faith, and not cumbersome." *Perry, supra*, 708 F.2d at 1262. In keeping with *Perry*, the first step in analyzing the CTU Implementation Plan is to determine whether it meets these three criteria. The task is, by necessity, speculative, since the procedure has not yet actually been used. Nevertheless, this Court cannot conclude that the CTU rebate procedure is unfair, administered in bad faith, or cumbersome.

First, there is nothing unfair in the way the rebate procedure is designed to be administered. Plaintiffs maintain that a rebate procedure designed by the union and administered internally is fundamentally flawed under the principle that "no man should be a judge in his own case." They suggest that a "closed-door review of their objections by the very people that presumably violated their rights in the first place" is unlikely to yield a fair or impartial hearing.

That there is nothing fundamentally unfair about an internal union procedure finds support in several cases. In *Brotherhood of Railway Clerks v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), the Supreme Court suggested that a more practical option than judicially administered relief would be for unions "to consider the adoption by their membership of some voluntary plan by which dissenters would be afforded an internal union remedy." 373 U.S. at 122, 83 S.Ct. at 1164. In *Abood, supra*, the Court found the *Allen* sugges-

---

**14.** These include: (1) it is CTU that sets the fee that it is to receive; (2) there is no provision for review of the amount of the fee by the Board; (3) non-member employees have no notice or opportunity for a hearing prior to deductions; (4) the rebate procedure is designed and operated by the union, not a detached, neutral tribunal; and (5) the rebate procedure is cumbersome.

tion "particularly relevant" in light of the union's newly adopted internal procedure. 431 U.S. at 240, 97 S.Ct. at 1802. The *Abood* Court stressed that it expressed no view as to the sufficiency of the internal remedy actually in use in Michigan, but nevertheless suggested that on remand, the dispute over the fair share fee be referred to the internal union remedy as a possible means of settling the disagreement. *Id.* at 242, 97 S.Ct. at 1803.

In *Capitol Powerhouse Engineers v. State of Washington, supra,* the Washington Supreme Court approved of a publicized, readily accessible internal union mechanism for dealing with political expenditures by the union to which an employee objects. 570 P.2d at 1049. Likewise, in *Carlson v. City of Portland,* 45 Or.App. 439, 608 P.2d 1198 (1980), an Oregon appellate court endorsed internal union procedures available for contesting the amount of deductions. 608 P.2d at 1202.

Although there may be a question as to whether an internal union procedure in a given context is fair, there appears to be consensus among the courts that have considered the question that there is nothing inherently unfair about an internal union procedure. *See, e.g., Reid v. U.A.W., District 1093,* 479 F.2d 517 (10th Cir.1973); *Seay v. McDonnell Douglas Corp.,* 533 F.2d 1126 (9th Cir.1976). In *Seay,* the court refused to rule as a matter of law that an internal union procedure was inherently fair or unfair. "[S]peculative, conclusionary, and argumentative statements condemn[ing] the Union remedy as unfair, unreasonable, and unworkable ... do not suffice to create an issue of fact.... At the most the statements are conjectures as to how the union remedy might work in imagined circumstances." 479 F.2d at 520.[15]

In light of *Seay* and *Reid,* the Court now turns to the facts of the instant case. The CTU Plan allows a hearing before an impartial tribunal in the person of an accredited arbitrator pre-screened by the Illinois State Board of Education. Arbitration is available to a complainant in as little as 75 days from the day his or her objection is properly raised. CTU freely admits that throughout the process it bears the burden of showing that the fair share deduction complies with the *Abood* criteria, and had, in fact, offered access to its records to one of plaintiffs for purposes of preparing her case in this regard. These facts suffice to dispel plaintiffs' fears that the procedure allows CTU "to be a judge in its own case." The safeguards built into the system insure that it is fair.

The next consideration is whether the CTU Implementation Plan is a good faith effort. Plaintiffs claim that the plan is a "sham ... designed only to give lip service to due process," and that CTU "never had any intention of permitting non-members to contest CTU's fair share fee." However, no evidence is presented to support this allegation. All of the evidence, in fact, points in the other direction. CTU widely publicized the Implementation Plan. The union carefully documented its calculation of the fair share fee and offered one plaintiff an opportunity to inspect the record. The union readily concedes typographical and mathematical errors of some $12,000 identified by plaintiffs during discovery; there is no reason to believe that the union would not have made a similar concession had the error been discovered during the internal procedure. It is true that CTU did unreasonably misconstrue the letters of plaintiffs Hudson and Underwood as something other than properly filed objections. However, the rebate process was a new one. Based on testimony at trial, the Court is inclined to view CTU's failure to expedite these two objections as an error in judgment due to excessive caution rather than bad faith.

Finally, in keeping with *Perry v. I.A.M., supra,* the Court must inquire whether the CTU Implementation Plan is cumbersome. The rebate procedure is a simple three-step

---

15. The plaintiffs in *Seay,* unlike those in *Read v. U.A.W. District 1093,* 479 F.2d 517 (10th Cir. 1973), *had* presented genuine issues of fact as to whether the union could or would administer the intra-union remedy fairly. As a result, the Court remanded the case for further investigation.

process which can be completed within as little as 75 days of a non-member's sending an objection to CTU. The procedure was widely publicized prior to its inception, and all those who contacted the union received a copy of the procedure, drafted in terms readily understood by laypersons. Objecting non-members were given a full month after the first payroll deduction to register their objections. The cost of the procedure is to be borne by CTU.

The simplicity of the CTU rebate process stands in sharp contrast to those struck down in such cases as *Perry, supra,* and *Robinson v. State of New Jersey, supra.* In *Robinson,* for example, the court consolidated the internal procedures of three unions for review. In one of the procedures, the objector had to fill out a form stating his reason and information for the complaint, and wait over 90 days for a first hearing. Internal delays, traced in part to the multi-tiered union system, postponed for over a year notification by the union of its rejection of the objector's claim. Under the procedure set up by a second union, the experience of objectors was, if anything, worse. The procedure required a written objection be made within 30 days of the first deduction, which would result in an escrowing of deductions for 12 months until the year's fiscal records were complete. At that point a second challenge had to be mailed, to be disposed of "informally" by the Union. If still unsatisfied, the complainant had to mail out yet another challenge, this time to a regional panel. After that, the objector was referred to a statutory body, the three-member State Representative Fee Review Board. In both unions, the information documenting the calculations of the rebates was so inadequate as to shift the burden of proof onto the objectors.

In *Perry v. I.A.M., supra,* an objector had only two weeks to mail an objection—to both the union headquarters and to the local. A two-tiered hearing procedure followed, first before a committee of the union, and then before the union's executive council. The objector apparently bore the burden of establishing error. Up to 18 months could elapse before the fair share fee was refunded. There was no provision for neutral arbitration. Further, the union made no attempt to explain the rebate procedure to the objector-plaintiff.

To conclude the review of the facts in the case at bar, this Court perceives significant differences between the CTU Plan and those other internal rebate procedures correctly rejected in *Robinson* and *Perry.* It should be stressed that this conclusion is necessarily based on the plan *as designed,* since there is, as yet, no actual experience with it. If, at some future date, plaintiffs can show that the actual operation of the procedure is unreasonably lengthy or expensive, the CTU has been uncooperative or obstructive, or that CTU's initial calculation of the fair share fee was so clearly misstated as to infer bad faith, then the Court would not hesitate to strike down as unconstitutional the CTU Implementation Plan. Under the facts of the instant case, however, the Court is simply unable to discern anything unfair, administered in bad faith or cumbersome about the CTU rebate plan. Consequently, the Court is unable to avoid squarely facing the issue on which the Seventh Circuit reserved judgment in *Perry, i.e.,* whether a rebate procedure undertaken in connection with a fair share deduction from non-union members' paychecks may, under certain circumstances, adequately protect non-members' First Amendment rights under *Abood.*[16]

---

**16.** The Court notes that the U.S. Supreme Court has granted certiorari in *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks,* — U.S. ——, 103 S.Ct. 1767, 76 L.Ed.2d 341 (1983). One of the questions presented there is whether, when a union collects and spends compulsory union dues and agency fees for purposes other than negotiation and administration of the collective bargaining agreement, a scheme that allows for a subsequent union-determined rebate of a portion of dissenting employees' dues or fees satisfies the requirements of the Railway Labor Act and the First Amendment.

The CTU's pressing need for funds makes prompt resolution of this suit important, and does not permit this Court to await the outcome of the Supreme Court's decision.

In considering whether a rebate procedure is *per se* unconstitutional, both the First and Fourteenth Amendments are implicated. When First Amendment interests are at stake, the least restrictive means of effectuating government interests must be employed. *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Perry,* 708 F.2d at 1262. As noted earlier, the government has a compelling interest in maintaining labor peace and in eliminating the risk of "free riders." *Abood,* 431 U.S. at 224, 97 S.Ct. at 1794. The Supreme Court has recognized that unions must have access to substantial funds in order to carry out their obligations—both to members and non-members:

> The designation of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expenditure of much time and money. *See, Street,* 367 U.S. at 760 [81 S.Ct. at 1795]. The services of lawyers, expert negotiators, economists and a research staff, as well as general administrative personnel, may be required.

431 U.S. at 221, 97 S.Ct. at 1792.

A system that requires non-members to contribute a fair share fee, subject to subsequent reimbursement if the contribution turns out to be in excess of *Abood*-permitted union expenditures, is among the most effective ways to provide the union with the timely, steady, dependable flow of revenue to which it is entitled. The drawback to a rebate system is that it may temporarily appropriate and spend a portion of non-members' contributions for purposes impermissible under *Abood,* thus violating, even if only for a short period of time, non-members' First Amendment rights.

Prior case law is, unfortunately, of little assistance in reaching a definitive answer to the issue of whether a rebate procedure may be constitutional. In *International Ass'n. of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Supreme Court suggested a remedy for employees dissenting over the union's expenditure of a portion of their contributions for political activities. The remedy suggested was "*restitution* to each individual employee of that portion of his money which the union expended, despite his notification, for the political causes to which he had advised the union he was opposed." 367 U.S. at 775, 81 S.Ct. at 1803. This remedy, noted the Court, could be enforced "with a minimum of administrative difficulty and with little danger of encroachment on the legitimate activities or necessary functions of the unions." *Id.* at 774, 81 S.Ct. at 1802.

Likewise, in *Brotherhood of Railway Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), the U.S. Supreme Court suggested a "practical" remedy for an employee complaining that the union had spent a portion of his contribution in violation of his First Amendment rights:

> (1) the refund to him of a portion of the exacted funds in the same proportion that union political expenditures bear to total union expenditures, and (2) a reduction of future such exactions from him by the same proportion.

373 U.S. at 122, 83 S.Ct. at 1164.

Later, in *Abood,* the Court found *Allen's* suggested remedy "particularly relevant" to the Michigan fair share fee system, since the Michigan union had set up an internal remedy which provided, *inter alia,* for a "pro rata *refund*" to a dissenting employee of a portion of his fair share fee. 431 U.S. at 240, n. 41, 97 S.Ct. at 1802, n. 41 (emphasis added). The Court stated that, on remand, it would be appropriate to defer judicial proceedings pending a voluntary utilization by the parties of the rebate system. *Id.* at 242, 97 S.Ct. at 1803. At the same time, the Court added, "We express no view as to the constitutional sufficiency of the internal remedy described by the appellees." *Id.,* n. 45. Whether the Court was reserving judgment on rebate procedures in general or simply on the one in Michigan has been a subject of some controversy. *See, School Committee of*

*Greenfield v. Greenfield Education Ass'n,* 385 Mass. 70, 431 N.E.2d 180 (1982); *Capital Powerhouse Engineers v. State of Washington,* 89 Wash.2d 177, 570 P.2d 1042 (1977). In our Circuit, the Court of Appeals, in *Perry v. I.A.M., supra,* underscored the issue, but found it unnecessary to resolve it under the facts of that case. 708 F.2d at 1261–62.

Turning to decisions in other jurisdictions, this Court is constrained to view the statements of those courts finding rebate procedures *per se* unconstitutional as having limited precedential value as their holdings are ultimately based on the very specific facts of the procedures in question. Illustrative is *Robinson v. State of New Jersey,* 547 F.Supp. 1297 (D.N.J.1982). There, the court stated, "When confronted with the realities ... in this case, ... it becomes apparent that a demand and return system cannot protect a non-member's First Amendment rights." *Id.* at 1322. Elsewhere in the same opinion, the court said that the rebate procedure in New Jersey "in reality ... does not constitute a system by which a non-member can recover that portion of the fees paid by him...." *Id.* In the last analysis, the *Robinson* court appears to have struck down the procedure not as a rebate system, *per se,* but as an unusable rebate system.

In the absence of persuasive precedent, a decision on the CTU rebate procedure must ultimately be resolved under the "least restrictive means" test in *Kusper v. Pontikes, supra,* as applied to the specific facts of the case at bar. Of major significance in the instant case is that before any fair share fee may be deducted, a prior adjustment must first be made to account for, and exclude *Abood*-prohibited expenditures. This front-end reduction in fees is mandated by the Illinois legislature in Ill. Rev.Stat. ch. 122 ¶ 10–22.40a, and built into the collective bargaining agreement between CTU and the Board in Art. 1, § 8.2. From the evidence presented at trial, it appears that CTU made a thorough analysis of its financial records in good faith compliance with both the statute and its agreement with the Board. As a result, non-members were *not* required to contribute an amount equal to union dues, as allowed in some states,[17] or an arbitrary, predetermined percentage of dues, as allowed in others.[18] Instead, non-members were required to contribute only a carefully pre-calculated portion of union dues. Of course, the union's calculations might be inaccurate or reflect errors in judgment. As a practical matter, however, such errors should require only minor refinement of the fair share fee. Thus, the pre-deduction adjusting of the fair share fee successfully minimizes the risk of unauthorized expenditure of non-members' funds. To the extent that minor correction is required, the rebate procedure allows for impartial arbitration within as little as two and one-half months from the date of the first deduction.

To be sure, in this, the first year of CTU's calculation of the fair share fee, the margin for error is greater than it should be in subsequent years, because many of CTU's basic judgments as to the political nature of certain expenditures are subject to challenge. For example, $2,167,000 of CTU's income of $4,103,701.58 was passed on to affiliated state and national labor organizations, an expenditure which plaintiffs challenge under *Abood.* But even assuming, *arguendo,* that CTU had grossly miscalculated the fee—let us say by as much as 50 percent—the error over the six-week rebate gap would add up to only $24.72 per school teacher (based on a monthly deduction of $16.48). A brief withholding of less than $25, weighed against the union's legitimate need for revenue, suggests just how carefully drawn the rebate plan actually is. More importantly, such major discrepancies will present only a one-time problem. Once resolved, the margin of error in fair share calculations should shrink to minimal dimensions in future years.

In conclusion, under the test in *Kusper v. Pontikes,* the rebate procedure embodied

---

**17.** For example, Michigan.

**18.** For example, New Jersey and Minnesota.

in the CTU Implementation Plan presents so small a risk of violating non-members' First Amendment rights as to be negligible, and is, at the same time, the most effective, efficient way to guarantee to CTU the immediate, steady flow of funds it needs to represent *all* employees, including non-members. As such, the CTU Implementation Procedure is the least restrictive means of effectuating government interests.

The same caveat mentioned earlier applies to the Court's holding here: the instant decision is based on the facts presented. Should non-members, at some future date, successfully demonstrate that the union is calculating the fair share fee in bad faith, unduly encumbering the rebate procedure, or in any other way acting unfairly, a violation of the First Amendment may well be found to exist. Under the present circumstances, however, there is simply no basis to find the CTU Plan offensive.

The final issue plaintiffs raise is that the CTU Implementation Plan violates their procedural due process rights under the Fourteenth Amendment. They claim that they are entitled to prior notice and a hearing before they may be deprived of wages or freedom of association.[19] This Court has already determined that plaintiffs' First Amendment rights have not been violated. As for the deprivation of property accomplished through the CTU rebate procedure, this Court holds that it fully comports with the Fourteenth Amendment.

Plaintiffs put forward a creative argument for their position. They view the principle behind the fair share fee requirement as analogous to the remedy of *quan-*

*tum meruit,* and thus cast the union and non-members in the respective roles of creditor and debtor. Under the rebate procedure, they argue, CTU dictates the amount of the "debt" to be collected from non-member employees. Hence, according to plaintiffs, "the role of the School Board is nothing more than the enforcer of a prejudgment garnishment demand by the Local Union." Completing their argument, plaintiffs cite *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), for the proposition that it is a denial of procedural due process to garnish wages without first providing notice and an opportunity to be heard.

This argument, at first glance, has a certain appeal. A closer look, however, reveals that there is but a superficial resemblance between the payroll deduction plan at issue here and the type of prejudgment garnishment struck down in *Fuentes.* One example, of several possible distinctions, suffices to demonstrate why the analogy is misleading. To the extent that the analogy has any merit, the "garnishment" in question has more in common with a *post*-judgment than the prejudgment procedure present in *Fuentes.* Both the Supreme Court, in *Abood,* and the state of Illinois, by statute, have already recognized that non-members do, in fact, owe money to their exclusive bargaining representative. Thus, unlike a prejudgment garnishment proceeding, where the very existence of a debt may be at issue, the rebate procedure in the instant case proceeds from certainty on this crucial point.[20]

---

**19.** Plaintiffs argue that the School Board has a duty to verify the fair share calculation and provide a pre-taking forum for dissenting nonmembers. The Court questions whether the Board, as employer, is the appropriate party to champion the constitutional rights of its employees in a dispute against the exclusive bargaining representative. For any employer—public or private—to be placed in a position of exercising a veto over a union's allocations and expenditures would create a serious imbalance in bargaining power. *Metropolitan Edison Co. v. NLRB,* —— U.S. ——, 103 S.Ct. 1467, 1475, 75 L.Ed.2d 387 (1983); *cf. Detroit Edison Co. v. NLRB,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d

333 (1979). In the last analysis, it is the nonmember employee who is the real party in interest, and who should bring the challenge. *Cheshire Board of Education,* Case No. TDR–7008, Dec. No. 2153, Govt. Employee Relations Report, 980.20–21 (August 26, 1982).

**20.** A prior hearing with respect to a post-judgment garnishment is not necessarily required under the *Fuentes* line of cases. *See, e.g., First National Bank v. Hasty,* 410 F.Supp. 482 (E.D. Mich.1976); *Betts v. Coltes,* 431 F.Supp. 1369 (1977), 467 F.Supp. 544 (D.Haw.1979). *Cf. Finberg v. Sullivan,* 634 F.2d 50 (3rd Cir.1980).

■ Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 610, 94 S.Ct. 1895, 1901, 40 L.Ed.2d 406 (1974). Rather, due process is flexible, calling for such procedural protections as the situation demands. *Id.* "[T]he right to notice and an opportunity to be heard must be granted at a *meaningful* time and in a *meaningful* manner." *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972) (emphasis added). To determine whether a given administrative procedure comports with due process, the conflicting interests of the government and private parties must be balanced in light of three factors: (1) the private interest affected; (2) the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that an additional or substitute procedural requirement would entail. *Mathews, supra*, 424 U.S. at 335, 96 S.Ct. at 903.

Using this three-prong balancing test in the instant case, this Court concludes that the scales tip heavily in favor of the CTU rebate plan. As will become evident, the *Mathews* balancing test recapitulates much of the reasoning of the Court's earlier discussion. As to the first factor, the affected interests of non-members are their First Amendment rights of freedom of association plus their property interest in the amount of wages deducted. Second, the risk of an erroneous deprivation of either interest through the CTU Plan, even during this first year of operation, is minimal because of the statutory requirement, fully complied with by the CTU Plan, that a pre-deduction adjustment be made in the fair share fee. An opportunity to challenge the amount of the calculated fee would, it is true, minimize an already very small margin of error. Yet, the marginal cost of this incremental reduction in risk is unreasonably high. Finally, the governmental interests involved are compelling, and the cost of depriving the union of a steady, dependable source of income is inordinately burdensome.

In sum, the compelling state interest, coupled with the extremely low risk of an abridgement of non-members' rights, clearly does not justify the high cost of imposing an additional prededuction hearing. *Robbinsdale Education Assn. v. Robbinsdale Fed. of Teachers*, 307 Minn. 96, 239 N.W.2d 437 (1976), *aff'd. sub nom. Threlkeld v. Robbinsdale Fed. of Teachers*, 316 N.W.2d 551 (Minn.1982), *dismissed,* — U.S. ——, 103 S.Ct. 24, 74 L.Ed.2d 40 (1982).

The situation here is easily distinguishable from the *Fuentes* line of cases. First, the risks are of altogether different orders of magnitude, because in the instant case, the existence of a "debt" is already established, and the amount in question is subject to only minor adjustment. Second, the governmental interests implicated in a fair share fee are qualitatively and quantitatively more substantial than those of a private creditor. *Cf. Finberg v. Sullivan*, 634 F.2d 50 (3rd Cir.1980).

### III. *Conclusion*

For the foregoing reasons, the Court holds that Ill.Rev.Stat. ch. 122 ¶ 10–22.40a (1981) comports with the U.S. Constitution both on its face and as applied to the CTU Implementation Plan. As that plan provides a mechanism to determine the propriety of the amount of the fair share fee calculation, those plaintiffs who qualify are directed to proceed through such mechanism in their challenge of the amount deducted. Having ruled the plan to be constitutional, the Court declines the opportunity to decide questions regarding the amount of the fee as such a determination may properly be made under the plan.

Plaintiffs Underwood and Hudson have properly objected to calculation of the fair share fee under the Implementation Plan. The parties are directed to proceed with the claims of these plaintiffs under the scheme set out by the plan. If the amount of the

fee is deemed to be excessive, plaintiffs Underwood and Hudson will be entitled to a rebate and, along with all other non-members, to a prospective reduction in the amount deducted. Plaintiffs Sherrill, Holmes, McCoy, and Petitan, by failing to properly object within 30 days after the initial deductions were made, have waived their rights to object and, consequently, because they could not join in the objection, would not be entitled to a rebate should any properly objecting party succeed in securing a reduction in the fair share fee. They would, of course, benefit from such success in that any prospective reduction would reduce the amount deducted from future paychecks. In the event that a deduction were ever made from plaintiff McCoy's paycheck, she could, of course, object within 30 days thereafter. At this juncture, however, any objection by McCoy would be untimely as not ripe under the plan.

In light of the Court's holding herein, no ruling need be made on the plaintiffs' motion to proceed as a class action. Accordingly, such motion is deemed to be moot.

IT IS SO ORDERED.