**Annie Lee HUDSON, et al.,
Plaintiffs-Appellants,**

**v.**

**The CHICAGO TEACHERS UNION
LOCAL NO. 1, et al.,
Defendants-Appellees.**

No. 83–3118.

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1984.

Decided Sept. 6, 1984.

Rehearings and Rehearings En Banc
Denied Oct. 24, 1984.

Flaum, Circuit Judge, concurred in result and filed opinion.

Joseph J. Hahn, National Right to Work Legal Defense Foundation, Springfield, Va., for plaintiffs-appellants.

Charles Orlove, Jacobs, Burns, Sugarman & Orlove, Robert A. Wolf, Chicago Bd. of Educ., Chicago, Ill., for defendants-appellees.

Before POSNER and FLAUM, Circuit Judges, and GORDON, Senior District Judge.[*]

POSNER, Circuit Judge.

The Chicago Teachers Union has a collective bargaining contract with the city's Board of Education that makes the union the exclusive agent of teachers and certain other employees of the Board for collective bargaining. The contract contains a union-security clause which requires members of the bargaining unit who do not want to join the union to pay the union their proportionate share of the costs of the union's efforts to negotiate and administer the collective bargaining contract with the Board. The Board deducts this amount (the "agency fee") from these employees' wages, just as it deducts union dues from union members' wages. The plaintiffs, nonunion employees of the Board, brought this suit against the

Board and its members and the union and its officers under section 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983 (the plaintiffs have abandoned their pendent claims), challenging the procedure established pursuant to the collective bargaining contract for determining the proportionate share that nonunion employees must contribute to the support of the union as collective bargaining agent. After a bench trial, the district judge upheld the validity of the procedure, 573 F.Supp. 1505, and the plaintiffs have appealed.

■ After *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977)—like this a suit by nonunion employees of a school board against the board and the union, complaining that the union-security clause in the board's collective bargaining contract with the union violated the First Amendment as made applicable to the states by the Fourteenth Amendment—the plaintiffs cannot argue that a union-security clause violates the First Amendment even though it forces them to support financially an organization the policies and objectives of which they may disagree with, but which, disagree or not, they do not want to pay money to support. Since the collective bargaining contract makes the union the agent of all the employees in the collective bargaining unit, whether or not they are union members, every employee can be made to pay his proportionate share of the expenses that the union incurs in carrying out its responsibilities as agent; otherwise the nonunion employees would be taking a free ride on the union members' expenditures.

■ No more is it open to the defendants, after *Abood*, to contest the proposition that they may not, without violating the First Amendment, use money involuntarily extracted from the plaintiffs "for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to [the union's] duties as collective-bargaining representative." 431 U.S. at

[*] Hon. Myron L. Gordon, of the Eastern District of Wisconsin, sitting by designation.

235, 97 S.Ct. at 1799. It is true that the union is a private entity; that the Board, in withholding an "agency fee" from its employees' wages, was acting as the union's agent; and that section 1983 only reaches action under color of state law. But when a public employer assists a union in coercing public employees to finance political activities, that is state action; and when a private entity such as a union acts in concert with a public agency to deprive people of their federal constitutional rights, it is liable under section 1983 along with the agency. See *Tower v. Glover*, —— U.S. ——, 104 S.Ct. 2820, 2824–25, 81 L.Ed.2d 758 (1984); *Dennis v. Sparks*, 449 U.S. 24, 27–28, 101 S.Ct. 183, 186–187, 66 L.Ed.2d 185 (1980).

■ The unusual feature of this case is that the plaintiffs, while objecting in passing to particular uses of the agency fee, make almost their whole attack on the procedure for determining how much shall be deducted. A threshold question therefore is whether such an attack can be based on section 1983, which so far as pertinent to this case creates a federal remedy for the deprivation, under color of state law, of liberty, without due process of law. Although this question has not been discussed extensively, an affirmative answer is implicit in our decision in *Perry v. Local Lodge 2569 of Int'l Ass'n of Machinists*, 708 F.2d 1258, 1261–62 (7th Cir.1983), and in the Third Circuit's recent decision in *Robinson v. New Jersey*, 741 F.2d 598 (3d Cir.1984), and is also supported by the Massachusetts Supreme Judicial Court's decision in *School Committee v. Greenfield Education Ass'n*, 385 Mass. 70, 78–86, 431 N.E.2d 180, 186–90 (1982).

■ Most cases involving a union's duty not to use agency fees to support political or ideological endeavors that are not germane to the union's responsibilities as collective bargaining agent have arisen under the federal labor-relations statutes, either the National Labor Relations Act or the Railway Labor Act, rather than the Constitution. See, e.g., *International Ass'n of Machinists v. Street*, 367 U.S. 740, 768–69, 81 S.Ct. 1784, 1799–1800, 6 L.Ed.2d 1141 (1961). Those statutes have been interpreted to require a union to represent fairly all the members of the bargaining unit for which the union is the exclusive agent, and this obligation in turn has been interpreted to include a specific duty to the unit's nonunion employees to establish procedures that will make sure that the employees are not forced to pay for union activities other than those the union undertakes in its agency role. Maybe a similar duty could be inferred from the Illinois statute (Ill.Rev.Stat.1981, ch. 122, ¶ 10–22.-40a) that authorizes agency-fee clauses in collective bargaining contracts with school boards. *Meylor v. Boys*, 101 Ill.App.3d 148, 153, 56 Ill.Dec. 618, 621, 427 N.E.2d 1023, 1026 (1981), so suggests, in part by citing *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), a leading case on the duty of fair representation under federal labor law. But the violation of a duty under state law could not be challenged under 42 U.S.C. § 1983. Nor can we force the plaintiffs to allege such a violation, although if they had (more precisely, if they had not abandoned their pendent claims), we would have the power to decide the state-law issue first in order to avoid having to decide federal constitutional issues. *Hagans v. Lavine*, 415 U.S. 528, 545–50, 94 S.Ct. 1372, 1383–86, 39 L.Ed.2d 577 (1974). Pendent jurisdiction is not compulsory; and federal civil rights claimants are not required to exhaust their state remedies, *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), and *a fortiori* need not give a federal judge an opportunity to adjudicate state-law claims that they might have raised but did not.

The plaintiffs also cannot base their section 1983 claim on the discussions in *Abood* and other cases of the proper remedy once improper use of revenues generated by an agency fee is proved. See 431 U.S. at 237–42, 97 S.Ct. at 1800–03. These discussions presuppose the existence of a federal right that the improper expenditures violat-

ed. See *Ellis v. Brotherhood of Railway Clerks,* —— U.S. ——, 104 S.Ct. 1883, 1890, 80 L.Ed.2d 428 (1984). The question here is whether the plaintiffs have a federal right to challenge a procedure that may not have resulted in any improper expenditures —whether, in other words, even if the union has not used any of the money it has collected from objecting employees to promote political activities unrelated to its role in collective bargaining, the plaintiffs can still complain that they have been deprived of the liberty secured them by the Constitution.

We think they can, and on two grounds (conflated in *Robinson v. New Jersey, supra,* 741 F.2d at 611–612). First, a procedure that, lacking reasonable protections for nonunion employees, makes it likely that some of the money collected from them will be used to support political objectives not germane to the union's function in the collective bargaining process infringes the First Amendment even if the procedure is not shown to have resulted in any improper expenditures. Just the danger (as distinct from actuality) of depriving people of the freedom of expression guaranteed by the First Amendment has led courts to invalidate procedures that created the danger. See, e.g., *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 552–62, 95 S.Ct. 1239, 1243–48, 43 L.Ed.2d 448 (1975); *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Tribe, American Constitutional Law 724–36 (1978); Monaghan, *First Amendment "Due Process",* 83 Harv.L.Rev. 518 (1970). This body of First Amendment law has a long historical pedigree. At common law, free speech meant freedom from prior restraints—a procedural right. The press could not be licensed although it could be punished, after the fact in a criminal proceeding, for "disseminating ... bad sentiments." 4 Blackstone, Commentaries on the Laws of England 152 (1769); see Levy, Freedom of Speech and Press in Early American History: Legacy of Suppression 248 (1960). The present case, remote as it is from the classic prior restraint, illustrates in a new setting the close relationship between procedure and substance in free-speech cases. Since even a local union may have many members, and since most of the expenditures that a union makes are germane to its responsibilities in the collective bargaining process and thus do not violate the First Amendment even when the money expended comes in part from dissenting employees, the amount of monthly deductions potentially at issue in cases such as this is small for each such employee. As a result, most violations of the First Amendment caused by union-security clauses or union-shop clauses (which require all employees actually to join the union) would go unremedied—maybe even undetected—if the employer had no duty to establish workable procedures for protecting dissenters' rights. We interpret the First Amendment to create such a duty. True, in the cases cited earlier the duty was to those who wanted to speak rather than to those who wanted to dissociate themselves from a speaker. But the money that an objecting employee is compelled against his will to spend to support a union's political views is money not available to him to support other political activities, and this indirect effect on the marketplace of ideas is we think sufficient to require the creation of procedures that protect against such compulsion.

The defendants owe another constitutional duty to these plaintiffs—a "due process" duty as distinct from a "free speech" duty. We have put quotation marks around these terms to acknowledge that the terms are imprecise, and require explanation. The due process clause of the Fourteenth Amendment, besides being the vehicle by which parts of the Bill of Rights, including the First Amendment, have been held to be applicable to the states, is an autonomous source of rights, including the right not to be deprived of liberty without receiving the procedural safeguards summarized by the words "due process." The standard safeguards are timely and adequate notice of the impending deprivation

and a reasonable opportunity for a hearing before an impartial adjudicator. Although forcing a public employee to support a union does not take away his freedom of speech—provided his money is not used to pay for political or ideological activities that he disapproves of—it does deprive him of "liberty" within the meaning of the Fourteenth Amendment, and therefore requires the employer to give him due process of law in the sense of fair procedure, quite apart from any procedural safeguards required by the First Amendment directly.

The liberty in question is freedom of association. Although one could conceive of this freedom as extending over the whole range of private associations that are important to Americans—from the nuclear family to the social club to the political party—the cases, as we were reminded just the other day by the Supreme Court, mainly involve either the family or, as is more pertinent to the present case, associations having political or ideological goals, see *Roberts v. United States Jaycees*, —— U.S. ——, 104 S.Ct. 3244, 3249–55, 82 L.Ed.2d 462 (1984); and in political-association cases freedom of association is an offshoot of freedom of speech. See Tribe, *supra*, at 700–10. But we need not explore in this case the outer bounds of freedom of association. Although the primary goals of American trade unions are economic rather than political or ideological, American unions have always sought to further their goals in part by appeals to public opinion. To join a union is to join an association engaged in the dissemination of ideas and opinions that may be controversial.

■■■ The particular freedom of association we are speaking of—the freedom that is ancillary to freedom of speech—has a negative as well as a positive dimension. "Freedom of association ... plainly presupposes a freedom not to associate," *Roberts v. United States Jaycees, supra*, 104 S.Ct. at 3252 (citing *Abood*); see *Elrod v. Burns*, 427 U.S. 347, 357, 363–64 n. 17, 96 S.Ct. 2673, 2684–85 n. 17, 49 L.Ed.2d 547 (1976) (plurality opinion); *Abood v. Detroit*

*Board of Education, supra*, 431 U.S. at 235, 97 S.Ct. at 1799; *Robinson v. New Jersey, supra*, 741 F.2d at 604, which is infringed by making someone contribute money to an association engaged in political or ideological activities. True, freedom of association, whether positive or negative, is no more absolute than the other liberties that the due process clause protects against deprivation without due process of law. But the fact that it enjoys the procedural protections capsulized in the term "due process" means that the state cannot deprive an individual of his freedom of association by forcing him to support a union, except in accordance with procedures that reasonably assure that the deprivation will go no further than is necessary to prevent the individual from taking a free ride on an entity that (whether or not he wants to support it) is providing services to him as his collective bargaining representative.

■■■ The Supreme Court in *Abood* had no occasion to decide whether an agency fee exacted by a public employer on the union's behalf from a dissenting employee deprives the employee of his liberty of association and therefore may not be exacted unless the dissenter is given due process of law. But the Court did remark that "to compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests," and "to be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit." 431 U.S. at 222, 97 S.Ct. at 1793. By adding that "such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress," the Court made clear its view that even the use of agency fees for contract negotiation and administration is an interference with First Amendment liberty (though a lawful interference), offering as an example the union's negotiating a clause requiring the

employer to reimburse employees for the expense of abortions. *Id.*; see also *id.* at 256, 97 S.Ct. at 1810 (concurring opinion); *Roberts v. United States Jaycees, supra,* 104 S.Ct. at 3255; *id.* at 3257–61 (concurring opinion). Such interference is a deprivation of liberty that is forbidden to the states and their agencies without due process of law. Contrary intimations in *Railway Employes' Dep't v. Hanson,* 351 U.S. 225, 236–38, 76 S.Ct. 714, 720–21, 100 L.Ed. 1112 (1956), are no longer authoritative.

 The two grounds we have suggested for regarding the plaintiffs' procedural challenge as properly brought under section 1983—free speech and due process, as we have loosely called them—have different implications for the scope of protection. The first implies that the public employer must establish a procedure that will make reasonably sure that the wages of nonunion employees will not be used to support those of the union's political and ideological activities that are not germane to collective bargaining. The second implies that the procedure must make reasonably sure that those employees' wages will not be used to support *any* union activities that are not germane to collective bargaining, whether or not the activities are political or ideological. Thus expenditures not germane to collective bargaining, but not political or ideological either, would have a different status under the first and second grounds. But since the second ground is valid, it follows that the employer's obligation is not limited to establishing a procedure for preventing the diversion of nonunion employees' wages to political or ideological activities unrelated to the union's collective bargaining responsibilities; the procedure must make reasonably sure that the agency fee is not used for any unrelated activities.

Having established the legal standard for evaluating the procedure in this case, we turn to the particulars of that procedure. Soon after the union-security clause became effective on September 1, 1982, the union calculated the percentage of its expenditures that it believed (or at least claimed) had been costs of negotiating or administering the contract during the fiscal year that ended on June 30, 1982. On the basis of this calculation it set the agency fee at 95 percent of the union dues (for teachers, those dues were $17.35 a month for 10 months of the year), and asked the Board to deduct this percentage from the wages of nonunion employees. The Board began doing so in December 1982. But it did not tell the employees how the 95 percent figure had been arrived at, or about the procedure that had been established for challenging the figure, although the union described the procedure in the December issue of the union newspaper, which was widely circulated to nonmembers. Under the procedure, an objecting nonunion member has 30 days after the agency fee is first deducted from his paycheck to file an objection with the union. The union's executive committee reviews the objection. If it rejects it, the objector has 30 days to appeal to the committee, and if he appeals in time he is entitled to a personal hearing. If his objection is turned down on the basis of that hearing, he can ask for arbitration. The union's president picks the arbitrator from a list of arbitrators accredited by the state board of education; the union pays the arbitrator's fee; and the arbitrator's decision is final. If at any stage in the proceeding the objecting employee succeeds in getting the agency fee reduced, he is entitled to a rebate of the excess that has already been deducted from his wages, as well as to a reduction in future deductions. The union must make the same reduction for all other nonmembers as well, including those who were not parties to the grievance proceeding; but apparently it is not required to give them any rebate. None of the plaintiffs followed the prescribed procedure through to the end (some did not invoke it at all), but that is unimportant if the procedure violates their constitutional rights.

 The most conspicuous feature of the procedure is that from start to finish it is entirely controlled by the union, which is an interested party, since it is the recipient

of the agency fees paid by the dissenting employees. Cf. *Schneider v. Colegio de Abogados de Puerto Rico*, 565 F.Supp. 963, 975 (D.P.R.1983). It is not surprising therefore that some of the plaintiffs thought it futile even to ask the union to reduce the fee. Their perception was reinforced by the way in which the union handled their objections to the amount of the fee: as the district judge found, the union hindered (through inexperience, though, not malice) the efforts of several of the plaintiffs to file objections.

■■■ Although the Supreme Court in *Abood* suggested that an internal union procedure might be an appropriate method of protecting objectors' rights, see 431 U.S. at 240, 97 S.Ct. at 1802, it was merely repeating a suggestion that had been made in a case under the Railway Labor Act. *Brotherhood of Railway & Steamship Clerks v. Allen*, 373 U.S. 113, 122, 83 S.Ct. 1158, 1163, 10 L.Ed.2d 235 (1963). That act, as it has been interpreted, both imposes on the union a duty to represent dissenters fairly and creates remedies for violation of that duty. Probably, as we said earlier, the Illinois act imposes the same duty. But that is not certain. Maybe under Illinois law the union has no duty to nonmembers. This possibility casts doubt on the adequacy of a grievance procedure controlled by the union.

The problem would not be so serious if there were an independent arbitrator at the end if not at the beginning of the process. But the arbitrator is picked by the union. It is true that he is picked from a list which, we are told, contains about 50 names, thus confining the union's choice somewhat. But even if the Illinois law imposes on the union the identical duty of fair representation that the union would have if it were subject to the Railway Labor Act or the National Labor Relations Act, the union's relationship to dissenting members of the bargaining unit would, as a realistic matter, contain a sufficient residue of adverseness to raise serious objections to giving the union a unilateral choice of arbitrator. "The union's interests and those of the individual employee are not always identical or even compatible." *McDonald v. City of West Branch*, — U.S. ——, 104 S.Ct. 1799, 1804, 80 L.Ed.2d 302 (1984); see *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728, 742, 101 S.Ct. 1437, 1446, 67 L.Ed.2d 641 (1981).

There are 15 federal district judges in active service in the Northern District of Illinois, all unimpeachably accredited; and yet the union would not try to defend a procedure that let it (or the dissenters!) pick the judge to preside in this case. See *United States v. Bursten*, 560 F.2d 779, 786 (7th Cir.1977) (per curiam); *Barnes v. United States*, 241 F.2d 252, 254 (9th Cir. 1956); *United State v. Garrison*, 340 F.Supp. 952, 956 (E.D.La.1972). "Next to the impropriety of being Judge in one's own cause, is the appointment of the Judge." 2 Records of the Federal Convention of 1787, at 82 (Farrand rev. ed. 1937) (remarks of Gouverneur Morris). The situation here is even more troublesome. The arbitrator, unlike a federal judge, is not paid a salary that is independent of the number of cases he presides over, or of the goodwill of a litigant. The arbitrator is paid for each arbitration, and this gives him a financial interest in deciding cases favorably to the union—which hires him, and incidentally which pays him. "[N]o man is permitted to try cases where he has an interest in the outcome." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); see also *Brown v. Vance*, 637 F.2d 272, 276 (5th Cir.1981).

Another problem is that the arbitrator is required to decide whether union activities are political or ideological, on the one hand, or germane to the union's collective bargaining responsibilities on the other. And as these are not mutually exclusive categories he must also decide whether certain political or ideological activities are so intrinsic to the union's responsibilities as collective bargaining agent that the union should be allowed to force the dissenters to contribute to their expense. In *McDonald v. City of West Branch, supra*, the Supreme Court held that an arbitrator's deter-

mination that a public employee had been fired for cause was not entitled to collateral estoppel effect in the employee's subsequent 1983 suit for wrongful discharge, a suit based on an alleged violation of the First Amendment. This result suggests that the Supreme Court doubts the competence of arbitrators—whose area of expertise, after all, is the interpretation of contracts rather than the interpretation of the Constitution—to make First Amendment determinations. Compare 104 S.Ct. at 1803 with *Parrett v. City of Connersville*, 737 F.2d 690, 696–97 (7th Cir.1984). But that is what the arbitrator would have to do in any case where the dissenter objected that the agency fee that he was forced to pay was being used for impermissible political or ideological purposes.

■ The procedure that the defendants adopted in this case is constitutionally inadequate, and they must go back to the drawing board. But it would be unhelpful of us to leave the parties and the district court without any guidance. Without wanting to be dogmatic or to foreclose consideration of alternative procedures, we suggest that the constitutional minimum would be fair notice, a prompt administrative hearing before the Board of Education or some other state or local agency—the hearing to incorporate the usual safeguards for evidentiary hearings before administrative agencies— and a right of judicial review of the agency's decision. The combination of an internal union remedy and an arbitration procedure is unlikely to satisfy constitutional requirements given the nature of the issues to be decided and the union's stake in how they are decided.

■ The plaintiffs have a separate objection to the remedy that the existing procedure provides for those who invoke it successfully. The remedy is a rebate of the amount of the agency fee improperly deducted and a reduction in future deductions (the latter aspect of the remedy is not controversial). During the period between the deduction and the rebate, the union has the use of the dissenter's money, interest free. This means that even if the dissenter

wins, some of his money—the amount being measured by the value to the union of having this interest-free loan—ends up supporting the union's political activities. *Ellis v. Brotherhood of Railway Clerks*, *supra*, 104 S.Ct. at 1890, makes clear that such a rebate procedure is inadequate even if the union pays interest on the amount deducted, for "even then the union obtains an involuntary loan for purposes to which the employee objects." True, *Ellis* was a case under the Railway Labor Act rather than under the due process clause of the Fourteenth Amendment. But the reason that the Railway Labor Act was interpreted to limit the use of agency fees was to avoid the serious constitutional questions that would have been raised otherwise. See *International Ass'n of Machinists v. Street*, *supra*, 367 U.S. at 749–50, 81 S.Ct. at 1789–90; *Abood v. Detroit Board of Education*, *supra*, 431 U.S. at 219–20, 97 S.Ct. at 1791–92. We know from *Abood*, and have tried to make clear in this opinion, that the Constitution indeed requires the same safeguards for dissenters' rights as the earlier cases found were required by the federal labor statutes. It follows that *Ellis* is as good a precedent under the due process clause of the Fourteenth Amendment as under the Railway Labor Act. Therefore a procedure for protecting the rights of dissenters is not constitutionally adequate if it cannot make whole the dissenter who wins his case; and the rebate procedure in this case, like the one in *Ellis*, cannot.

It is true that in *Ellis* the union had made no effort to determine in advance what fraction of its dues was not pertinent to collective bargaining and therefore should not be charged to objecting nonmembers. But that is an immaterial difference, at least on the facts of this case. A union cannot just choose some level of agency fee and, if it chooses too high, have the use, interest free, of the excess that it is later ordered to refund, until it refunds it. In *Robinson v. New Jersey*, the Third Circuit found that a 15 percent advance reduction for nonmembers of the union pro-

vided a sufficient cushion to protect them. See 741 F.2d at 612 n. 12; cf. Developments in the Law, *Public Employment*, 97 Harv.L.Rev. 1611, 1733 n. 59 (1984). Here the advance reduction was only 5 percent.

The Court in *Ellis* suggested, as an alternative to the procedure that it invalidated, placing the dissenters' money in an escrow account in a bank or trust company while the legitimacy of the union's proposed use of it is being determined. 104 S.Ct. at 1890. Then the union gets no use out of the money unless it wins its dispute with the dissenter; but since it does get the money if it wins, together with any accrued interest, it has an incentive to place the escrow fund at a high interest rate, and its rights and those of nondissenters are protected along with the dissenters' rights. The union's counsel told us at oral argument that after this case was brought the union began voluntarily placing dissenters' agency fees in escrow. This was a step in the right direction but does not make the issue moot. The union has made no commitment to continue to place such fees in escrow are. The terms cannot be left entirely up to the union. The union might decide, for example, to forgo a high interest rate in order to punish dissenters (even though it would be punishing itself at the same time). It would be best if the union turned management and not just custody of the account over to a bank or trust company. But we need not go into those details here. It is enough to hold that a proper escrow arrangement is required in order to protect the dissenters' constitutional rights.

There are two loose ends to be tied up, and we are done. First, the plaintiffs argue that the Illinois statute (cited earlier) authorizing agency fees in collective bargaining contracts negotiated with school boards is unconstitutional because it fails to set forth constitutionally adequate procedures—or indeed any procedures—for determining dissenters' objections. We do not understand this argument. When the Board, pursuant to our decision, creates such procedures, the plaintiffs will not be able to complain just because those procedures are not written into a statute. Second, the Board of Education argues that it has a good-faith immunity from suit. Although this defense was alluded to in the Board's answer to the complaint, it appears to have been abandoned in the course of the proceedings in the district court (though this is not certain); and the court did not mention the issue in its opinion. Even if the Board has immunity, this would not affect the plaintiffs' right to an injunction and attorney's fees. See *Pulliam v. Allen,* —— U.S. ——, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984). The plaintiffs are seeking damages as well, but from the union as well as the Board, and the union is not immune. Cf. *Tower v. Glover, supra,* 104 S.Ct. at 2824–25. It is speculation at this stage whether the plaintiffs will attempt to get a damage judgment entered against the Board as well. Our uncertainty over whether immunity will ever be a live issue, the possibility that the issue was abandoned in the district court, and the fact that the district judge did not address it in his opinion persuade us not to deal with it either. The Board can if it wants try to renew the defense on remand; we make no prediction of its success in such an effort.

We reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion. Circuit Rule 18 shall not apply.

FLAUM, Circuit Judge, concurring in the result.

I agree with the majority opinion only insofar as it holds that the Chicago Teachers Union (CTU) plan for arbitration and rebate of agency fees violates the constitutional rights of those employees as the plan relates to fees used to finance political and ideological expenses of the CTU. In *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Supreme Court held that nonunion employees could not be compelled to contribute to political or ideological activities of a union. The majority in this case reaches a

step further and creates a constitutional right not to be compelled to contribute to any activities that are not germane to collective bargaining, regardless of whether the activities are political or ideological. The majority further holds that the CTU plan is invalid in allowing for arbitration and rebate of those fees. I believe that we need not reach these issues.

### A.

In 1981, the Illinois legislature passed a statute allowing local school boards to include in collective bargaining agreements a provision requiring nonunion employees "to pay their proportionate share of the cost of the collective bargaining process and contract administration, measured by the amount of dues uniformly required by members." Ill.Rev.Stat. ch. 122 ¶ 10–22.-40(a). The Chicago School Board and the CTU included such a provision in their collective bargaining agreement effective September 1, 1982. That provision states in pertinent part:

> All full-time employees covered by this Agreement who are not members of the UNION shall ... pay to the UNION each month their proportionate share of the cost of the collective bargaining process and contract administration measured by the amount of dues uniformly required by members of the UNION.

Agreement Between the Board of Education of the City of Chicago and the Chicago Teachers Union, Article 1, § 8.2 (hereinafter "agreement"). The CTU calculated its agency fee, and then adopted its plan for arbitration and rebate of fees by nonmembers. The plan allows nonunion members to object only to

> any expenditure of his or her proportionate share payments for political activities or causes, or for activities or causes involving ideological issues not germane to the collective bargaining process or contract administration.

Plaintiffs allege that, in calculating its agency fee, the CTU included expenses that are not related to collective bargaining and contract administration. In their com-

plaint, plaintiffs raised several pendent claims under the Illinois Constitution and under the state statute. In the district court and on appeal, however, plaintiffs have focused on federal constitutional challenges to the agency fee scheme. They argue that the inclusion of any such expenses, regardless of whether the expenses are political or ideological in nature, violates their first and fourteenth amendment rights. They further argue that the CTU arbitration and rebate plan violates these rights.

The district court did not determine whether the inclusion of the challenged expenses was constitutional. The court held that the arbitration and rebate procedure was constitutionally adequate, and it ruled that all disputes over included expenses would have to be determined initially through that procedure.

### B.

Plaintiffs have alleged that a portion of their agency fee is being used to pay for political and ideological activities of the union that are unrelated to collective bargaining and contract administration. It is clear that such an allegation states a cause of action for a violation of their constitutional rights of free speech and free association. *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Where nonunion members state such a cause of action, the constitution entitles them to a procedure that prevents their compulsory subsidization of the impermissible union activity without unduly restricting the union's ability to require them to pay their fair share of the cost of permissible activity. *Id.* at 237, 97 S.Ct. at 1800.

Both the procedure and remedy of the CTU rebate plan fail to meet this standard. The procedure relies on an arbitrator to determine whether expenses are ideological or political and thus cannot be charged to nonunion members. This involves "difficult problems in drawing lines," *id.* at 236, 97 S.Ct. at 1800, of constitutional origin. The Supreme Court has recently held that an arbitration award cannot be given pre-

clusive effect in a section 1983 suit, *Mc-Donald v. City of West Branch,* —— U.S. ——, 104 S.Ct. 1799, 1804, 80 L.Ed.2d 302 (1984), reasoning that because of institutional limitations on the arbitration process, arbitration "cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights." *Id.* 104 S.Ct. at 1803. Institutional limitations include the fact that most arbitrators are not lawyers, that an arbitrator's authority extends only to enforcing the terms of the contract, and that arbitral fact-finding is not equivalent to judicial fact-finding. *Id.* at 1803–04. These same limitations also make arbitration an inadequate forum for drawing lines as to permissible expenses based on the first and fourteenth amendments. Because arbitration may not protect constitutional rights, the CTU procedure is invalid.

The remedy—a rebate of the fee improperly deducted—also is constitutionally invalid. A rebate procedure allows the union temporary use of money for activities that violate nonunion members' rights. The temporary use of funds for improper purposes injures plaintiffs in two ways: it causes them to subsidize ideas with which they disagree; and it depletes their funds available for supporting causes with which they agree. *See Seay v. McDonnell Douglas Corp.,* 427 F.2d 996, 1004 (9th Cir.1970). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (plurality opinion); *see New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam). There are clearly less restrictive alternatives for the union. *See Ellis v. Brotherhood of Railway, Airline & Steamship Clerks,* —— U.S. ——, 104 S.Ct. 1883, 1890, 80 L.Ed.2d 428 (1984). Thus, the rebate system is improper. *See Abood v. Detroit Board of Education,* 431 U.S. at 244, 97 S.Ct. at 1804 (Stevens, J., concurring).

### C.

The majority opinion holds that the CTU's inclusion of any expenses that are not germane to collective bargaining but that are not political or ideological in nature violates plaintiffs' fourteenth amendment "liberty of association." *See ante* at 1193–1194. From this, it holds that the CTU procedure is unconstitutional in that it does not ensure that the deprivation of liberty does not go further than is necessary.

No other federal appellate court has yet reached the issue of whether nonunion members have a constitutional right not to be charged for expenses that are not germane but not political or ideological. I also do not reach this issue. It is clear that both the Illinois statute and the agreement prohibit the inclusion of any expenses other than the cost of collective bargaining and contract administration. The CTU procedure allows the plaintiffs' fees to be used temporarily for purposes that violate the statute and the agreement. It is possible that by allowing this, the procedure itself may violate the statute and/or the agreement. *Cf. Ellis v. Brotherhood of Railway, Airline & Steamship Clerks,* 104 S.Ct. at 1889–90 (union rebate plan violates Railway Labor Act by allowing for temporary use of fees collected in violation of Act).

It is a fundamental doctrine of federal adjudication, founded on strong prudential considerations, that a federal court should not resolve constitutional questions when an issue can be resolved on statutory or other grounds. This doctrine has been applied repeatedly where the nonconstitutional ground is a pendent state law claim. *See Hagans v. Lavine,* 415 U.S. 528, 546, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974) ("[t]he Court has characteristically dealt first with possibly dispositive state law claims pendent to federal constitutional claims") and cases cited therein; *Schmidt v. Oakland Unified School District,* 457 U.S. 594, 102 S.Ct. 2612, 73 L.Ed.2d 245, (1982) (per curiam); *Siler v. Louisville & Nashville R. Co.,* 213 U.S. 175, 193, 29 S.Ct. 451, 53 L.Ed. 753 (1909) (doctrine of deciding state pendent claim before reaching federal constitutional issue "is not departed from without important reasons"); *cf. Hutchinson v. Proxmire,* 443 U.S. 111,

122, 99 S.Ct. 2675, 2682, 61 L.Ed.2d 411 (1979). Moreover, the Supreme Court has repeatedly determined the validity of union security plans on statutory grounds before reaching constitutional issues. *See Ellis v. Brotherhood of Railway, Airline and Steamship Clerks,* 104 S.Ct. at 1890; *Railway Employes' Department v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). I find no reason to depart from the doctrine here. To say that plaintiffs here have not pressed their pendent claims as grounds for disposition of this case cannot justify a different approach. If it did, parties could in effect always force federal courts to reach constitutional issues by the simple expediency of failing to press, or even to plead in the first instance, statutory grounds.[1] It is for the courts, and not for the parties, to determine when a decision on constitutional grounds is both necessary and appropriate.

Whether the CTU procedure violates the statute or the collective bargaining agreement are questions purely of state law. Moreover, the parties have not argued this issue either in the district court or on appeal. Thus, I deem it inappropriate to consider these issues for the first time here. I would remand to the district court for a determination of whether this issue can be resolved on statutory or contractual grounds. *See Ruslan Shipping Corp. v. Coscol Petroleum Corp.,* 635 F.2d 648,

651–52 (7th Cir.1980). *Cf. Abood v. Detroit Board of Education,* 431 U.S. at 236 n. 33, 97 S.Ct. at 1800 n. 33 (Court ruled that it would not determine whether use of fees for "social expenses" was unconstitutional but would leave issue to state courts).

---

**1.** This approach, in my view, does not conflict with the Supreme Court's holdings in *Patsy v. Board of Regents,* 457 U.S. 496 (1982) and *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that exhaustion of state remedies is not required prior to bringing suit in federal court under 42 U.S.C. § 1983. Those cases hold that exhaustion is not a jurisdictional prerequisite to bringing suit in federal court. Nothing in those cases, or in their reasoning, requires a federal court to reach novel issues of constitutional law where an issue may be addressed on state statutory grounds.

The majority states that "[p]endent jurisdiction is not compulsory." *Ante* at 1191. It is of course clear that pendent jurisdiction is not compulsory as to the court; the district court has discretion to dismiss pendent claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The majority suggests, however, that pendent jurisdiction is not

compulsory as to the parties. This in effect is inconsistent with this court's holding in *Harper Plastics v. Amoco Chemicals Corp.,* 657 F.2d 939 (7th Cir.1981), that a federal court judgment on federal law issues will, as res judicata, preclude a subsequent state court suit where the state claims could have been brought as pendent claims in the federal suit. The court rejected the argument that the uncertainty that the federal court will exercise pendent jurisdiction justifies the failure to bring pendent claims. "We fail to discern the unfairness in requiring a plaintiff to join all relevant theories of relief in a single proceeding." *Id.* at 946. The federal claim in *Harper Plastics* was based on the antitrust statutes. The Ninth Circuit has applied *Harper Plastics* to bar a state court suit where the federal suit was brought in part under 42 U.S.C. § 1983. *Midkiff v. Tom,* 725 F.2d 502 (9th Cir.1984).