**Annie Lee HUDSON, et al., Plaintiffs,**

v.

**The CHICAGO TEACHERS UNION, LOCAL NO. 1, et al., Defendants.**

**No. 83 C 2619.**

United States District Court, N.D. Illinois, E.D.

Nov. 16, 1988.

Edwin Vieira, Jr., Independent Hill, Va., Margaret S. Garvey, Freeborn & Peters, Chicago, Ill., for plaintiffs.

Lawrence Poltrock, Witwer, Burlage, Poltrock & Giampietro, Chicago, Ill., Laurence Gold, David Silberman, AFL–CIO, Washington, D.C., Joseph Jacobs, Charles Orlove, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for defendant Chicago Teachers Union.

P. Kevin Connelly, Lederer, Reich, Sheldon & Connelly, Chicago, Ill., Patricia J. Whitten, Law Dept., Chicago Bd. of Educ., Chicago, Ill., for defendant Chicago Bd. of Educ.

## MEMORANDUM ORDER

BUA, District Judge.

Under the terms of an agency shop agreement, a union may represent a collective bargaining unit that includes nonunion employees. Ever since it recognized the validity of the agency shop, the Supreme Court has striven to strike an appropriate balance between the competing rights of unions and nonunion employees in the agency shop context. *See, e.g., Ellis v. Brotherhood of Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). In its latest effort to preserve this delicate balance, the Court has held that before a union can collect fair share fees from nonunion employees, the Constitution requires the union to provide "an adequate explanation of the basis for the fee." *Chicago Teachers Union, Local No. 1 v. Hudson,* 475 U.S. 292, 310, 106 S.Ct. 1066, 1078, 89 L.Ed.2d 232 (1986). Spurred by the Supreme Court's *Hudson* directive, the Chicago Teachers Union ("CTU") overhauled its constitutionally deficient fair share scheme, developing and promulgating a more elaborate notice of its fair share fee. In the two years since the *Hudson* case was remanded to this court, the CTU has continued to collect fair share fees, but has deposited these revenues with the Clerk of the Court pending a determination that the CTU's revised notice is constitutionally sufficient. The CTU now moves this court to authorize the release of the fair share funds held in escrow. After examining the CTU's fair share fee notice for the 1987–88 school year, this court concludes that the CTU has satisfied the notice requirement established by the Supreme Court in *Hudson.* Therefore, the court grants the CTU's motion to release the fair share

funds currently held by the Clerk of the Court.

## PROCEDURAL HISTORY

Under the terms of a 1967 collective bargaining agreement, the CTU serves as the exclusive representative of a bargaining unit composed of 27,500 employees of the Chicago Board of Education ("Board"). Although the CTU negotiates employment contracts for all employees in the bargaining unit, approximately 5% of these employees do not belong to the CTU. During the first fifteen years of the bargaining unit's existence, dues collected from CTU members provided the sole source of financing for the CTU's collective bargaining efforts. Thus, until the early 1980s, nonunion employees in the bargaining unit received all the benefits of collective bargaining without bearing any of the costs. In an effort to remedy this "free rider" problem, the Illinois General Assembly amended the state's School Code by enacting a fair share fee statute in 1981. The statute provided that when a school board has a collective bargaining agreement with its employees, the board may require that its nonunion employees pay their proportionate share of the cost of collective bargaining to the union representing the bargaining unit. To ensure enforcement of a school board's fair share fee requirement, the statute also authorized the board to make appropriate deductions from the paychecks of nonunion employees. Ill.Rev. Stat. ch. 122, para. 10–22.40a (1987). Acting under this newly granted statutory authority, the Board began to deduct proportionate share payments from the paychecks of its nonunion employees during the 1982–83 school year. The CTU assisted the Board in implementing this fair share scheme by calculating the amount of the proportionate share deduction. Based on financial records from the previous year, the CTU determined that approximately 5% of its expenditures did not relate to collective bargaining or contract administration. Consequently, the CTU set the proportionate share fee at 95% of union dues. In anticipation of complaints from the Board's nonunion employees, the CTU also estab-

lished a procedure for considering objections to the amount of the proportionate share deduction.

In March 1983, seven of the Board's nonunion employees filed this lawsuit against the CTU, the Board, and their respective officers. Basing their suit on 42 U.S.C. § 1983, plaintiffs assailed the constitutionality of the Illinois fair share fee statute. They asserted that the statute, both on its face and as applied, violated their rights under the First and Fourteenth Amendments. In addition to seeking damages, plaintiffs requested a preliminary injunction prohibiting the Board from making any further proportionate share deductions. After conducting a hearing on the subject, this court denied plaintiffs' motion for a preliminary injunction. 573 F.Supp. 1505 (N.D.Ill.1983). In rejecting plaintiffs' request for injunctive relief, the court found that the challenged statute was facially valid. *Id.* at 1512–14. The court also determined that defendants' application of the statute did not offend the Constitution. Under the Board's 1982 fair share deduction scheme, the CTU made a prededuction adjustment of the fair share fee. Additionally, the CTU provided nonunion employees with a postdeduction opportunity to object to the fee. If an employee raised a valid objection to the amount of the fee, the CTU would issue rebates of any improperly deducted funds to all nonunion employees. The court concluded that these procedures adequately safeguarded plaintiffs' constitutional rights. *Id.* at 1514–21.

Disagreeing with this conclusion, the Seventh Circuit reversed this court's judgment. 743 F.2d 1187 (7th Cir.1984). A three-judge appellate panel found that although the fair share fee statute passed constitutional muster, the CTU's procedures for implementing the statute violated plaintiffs' constitutional rights. In particular, the panel criticized the CTU's objection procedure, which provided for postdeduction arbitration and rebates. Writing for two of the three judges on the panel, Judge Posner ruled that this procedure did not take sufficient precautions against the improper use of fair share contributions to

finance political or ideological activities unrelated to collective bargaining. *Id.* at 1194–96. As the Supreme Court recognized in *Abood v. Detroit Board of Education, supra,* a union's expenditure of fair share funds to support political causes violates nonunion employees' First Amendment rights to free speech and free association. Judge Posner's critique of the CTU's procedure, however, went beyond the First Amendment concerns articulated by *Abood.* In an unprecedented ruling, he asserted that the Fourteenth Amendment prohibits a union from using fair share funds "to support *any* union activities that are not germane to collective bargaining, whether or not the activities are political or ideological." 743 F.2d at 1194 (emphasis in original). The challenged CTU procedures did not entirely foreclose the possibility that the CTU might spend fair share contributions on nonpolitical activities unrelated to collective bargaining. Consequently, based on his novel "due process" theory, Judge Posner concluded that defendants' fair share scheme unconstitutionally deprived plaintiffs of their liberty of association without due process. *Id.* at 1194–96.

Judge Flaum, the third judge on the *Hudson* panel, concurred in the result. *Id.* at 1197 (Flaum, J., concurring). He agreed with the other judges on the panel that the CTU's procedure for considering objections to the proportionate share fee did not adequately protect the First Amendment rights of nonunion employees. *Id.* at 1198–99 (Flaum, J., concurring). With respect to Judge Posner's finding of a due process violation, however, Judge Flaum parted company with his colleagues. According to Judge Flaum, both the Illinois statute and the Board's collective bargaining agreement prohibited the very same expenditures that Judge Posner found impermissible under the due process clause. Since the courts could preclude such improper expenditures simply by applying state law, Judge Flaum reasoned that the Court of Appeals did not need to reach the due

process issue. Regarding Judge Posner's due process analysis as unnecessary and inappropriate, Judge Flaum declined to join the majority opinion. *Id.* at 1199–1200 (Flaum, J., concurring).

Defendants appealed the Seventh Circuit's *Hudson* ruling to the Supreme Court. A unanimous Court affirmed the Seventh Circuit's finding that defendants' fair share scheme did not adequately guard against ideological expenditures that would violate the First Amendment rights of nonunion employees. 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). Unlike Judge Posner, however, the nine Justices saw no need to consider the due process implications of nongermane, nonideological expenditures. *Id.* at 304 n. 13, 106 S.Ct. at 1074 n. 13.[1] Having invalidated the CTU's objection procedure on First Amendment grounds, the *Hudson* Court focused on devising a procedural framework that would better protect the free speech rights of fair share contributors. The Court held that when a union collects proportionate share fees, the Constitution requires that the union provide nonunion employees with "an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 310, 106 S.Ct. at 1078. After articulating these procedural requirements, the Supreme Court remanded the *Hudson* case to this court for the determination of an appropriate remedy. *Id.* at 310–11, 106 S.Ct. at 1078.

Following the remand, plaintiffs moved for certification of a class action on behalf of all nonunion employees in the bargaining unit. This court referred the motion to Magistrate Joan Lefkow, who recommended class certification. Declining to adopt the magistrate's recommendation, the court denied plaintiffs' motion for class certification in October 1987. 117 F.R.D.

---

**1.** *See also id.* 475 U.S. at 311, 106 S.Ct. at 1078 (White, J., concurring) ("[S]ince the Court, as did Judge Flaum in the Court of Appeals, deems it unnecessary to reach the issue of nonger-

mane, nonideological expenditures, the panel's remarks on the subject are therefore obvious dicta. Under our cases, they are also very questionable.").

413 (N.D.Ill.1987). The court observed that plaintiffs' Supreme Court victory had already ensured injunctive relief for all prospective class members. Given the success already achieved by plaintiffs, only one objective would remain for the proposed class to pursue: the acquisition of money damages for individual class members. In accordance with Seventh Circuit case law, this court concluded that the previous adjudication of the merits of plaintiffs' claims precluded certification of a class whose members sought money damages. *Id.* at 415.

In the meantime, the CTU began taking steps to comply with the Supreme Court's *Hudson* mandate. At the outset of the 1986–87 school year, the CTU provided nonunion employees in its bargaining unit with a revised notice of the fair share fee. Pending a determination that the CTU's revised notice passes constitutional muster, the parties to this lawsuit agreed that all fair share funds collected by the CTU would be deposited with the Clerk of the Court. *See* Fed.R.Civ.P. 67. In June 1987, the CTU moved for release of these funds, contending that its 1986–87 fair share notice satisfied the constitutional requirements established by the Supreme Court in *Hudson.* By the time plaintiffs filed their objections to the CTU's motion to release, the 1987–88 school year had commenced, and the CTU had further refined its fair share notice. At this point, the parties shifted their attention to the newly promulgated 1987–88 notice. The CTU argued that this new notice adequately protected plaintiffs' constitutional rights, thereby justifying dissolution of the escrow arrangement. In response, plaintiffs renewed their objection to the release of fair share funds to the CTU. While conceding that the CTU had improved on its fair share notice from the previous year, plaintiffs insisted that the 1987–88 notice remained constitutionally deficient.

## DISCUSSION

In the belligerent, intransigent style that has typified their arguments throughout this litigation, plaintiffs stridently oppose the release of any fair share funds to the CTU. They contend that the CTU has made little or no progress in producing a notice that complies with the Supreme Court's *Hudson* mandate. Curiously, however, plaintiffs' most adamant objections to the motion to release have nothing to do with the sufficiency of the CTU's fair share notice. Instead, plaintiffs complain most vociferously about the CTU's calculation of the fair share fee. For instance, they claim that the CTU has based its fee calculation on "legally incorrect" definitions of collective bargaining.[2] Plaintiffs also criticize the CTU for using a direct-cost methodology to allocate costs between collective bargaining and nongermane activities. Based on the deposition testimony of Sam Peltzman, a University of Chicago economist, plaintiffs assert that the economically flawed direct-cost method of cost allocation produces an unreliable estimate of the fair share fee. They insist that the CTU cannot hope to make an accurate assessment of the fee without first adopting a marginal-cost methodology for allocating costs.[3] In

---

**2.** Plaintiffs claim to have identified "glaring definitional errors" in the notice. The definitions challenged by plaintiffs, however, are not as obviously erroneous as plaintiffs would have this court believe. For instance, plaintiffs assert that the CTU erred in classifying union organizing and public relations as "collective bargaining." The Illinois Educational Labor Relations Board recently rejected this argument, concluding that Illinois law permits a union in an agency shop context to charge nonunion employees for the expenses of union organizing. *Klaetsch and Lake County Federation of Teachers, Local 504,* No. 85–FS–0044–C, slip op. at 66–67 (IELRB June 24, 1988).

**3.** Ironically, if plaintiffs were to succeed in imposing marginal-cost accounting on the CTU, they might ultimately discover that they had achieved a Pyrrhic victory. Professor Peltzman has testified that under a marginal-cost methodology, the fee charged to nonunion employees could eventually exceed the dues paid by CTU members. Deposition of Sam Peltzman, May 27, 1988, at 119. This unpalatable outcome would undoubtedly give plaintiffs a new appreciation of the CTU's direct-cost methodology. Plaintiffs have derisively characterized this direct-cost approach as "voodoo economics"; but the vagaries of the "science" of economics can transform catcalls into cheers, as George Bush can attest. During his 1980 campaign for the Presidency, Bush used the term "voodoo eco-

addition, plaintiffs challenge the propriety of the CTU's formula for determining non-union employees' proportionate share of collective bargaining costs.

■ Even assuming the validity of these arguments, plaintiffs' objections to the calculation of the fee have little if any relevance to the issue that now confronts this court: Is the CTU's 1987–88 fair share notice constitutionally sufficient,[4] thereby justifying release of the funds held in escrow? If anything, plaintiffs' specific attacks on the derivation of the fee suggest that the revised notice is performing its proper constitutional function—providing potential objectors with "sufficient information to gauge the propriety of the union's fee." *Hudson*, 475 U.S. at 306, 106 S.Ct. at 1075. After all, plaintiffs could not possibly have raised such detailed objections to the fee if the CTU's fair share scheme continued to "[l]eav[e] the non-union employees in the dark about the source of the figure for the agency fee." *Id.*

■ Plaintiffs argue that the CTU's fair share notice cannot survive constitutional scrutiny unless the notice incorporates legally correct definitions of collective bargaining and an economically sound methodology for calculating the fair share fee. This argument mistakenly equates the adequacy of the notice with the accuracy of the fee assessment. The Supreme Court in *Hudson* recognized that a fair share notice could sufficiently serve its constitutional purpose—providing information about the basis for the fee—without necessarily guaranteeing the accuracy of the fee. In fact, the *Hudson* Court anticipated that nonunion employees might dispute the amount of the fee after reviewing the notice. To deal with this contingency, the Court required the CTU to provide "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 310, 106 S.Ct. at 1078. In light of the overall procedural framework prescribed by *Hudson*, plaintiffs cannot plausibly contend that the notice's adequacy depends on the fee's accuracy. Based on their conception of "adequate notice," plaintiffs would have this court purge the CTU's fair share scheme of all imperfections before releasing the funds held in escrow. Such extensive judicial intervention in the initial calculation of the agency fee would effectively eliminate the need for *Hudson*'s impartial decisionmaker. Having required the CTU to establish its own objection procedure, the *Hudson* Court could not have intended for the federal judiciary to supersede the internal union procedure for resolving fee disputes. By urging this court to consider the alleged errors in the CTU's fee calculation, plaintiffs are asking the court to overstep the bounds imposed by an appropriate sense of judicial restraint. As one illustrious appellate judge has already discovered during this litigation, the Supreme Court will not tolerate such a gratuitous exercise in judicial activism. *See, e.g., id.* at 304 n. 13, 106 S.Ct. at 1074 n. 13 (*Hudson* Court found no need to reach due process issue addressed by Judge Posner); *id.* at 311, 106 S.Ct. at 1078 (White, J., concurring) (dismissing Judge Posner's due process remarks as "very questionable" dicta).

■ Plaintiffs assert that their fundamental objections to the CTU's legal and economic methodology call into question the entire basis for the fee. For this reason, plaintiffs insist that all fair share revenues should remain in escrow. Admittedly, plaintiffs' challenges to the calculation of the fee probably justify the maintenance of an escrow arrangement—but not in federal

nomics" to describe the economic policies of one of his rivals—Ronald Reagan. Eight short years later, President-elect Bush is lauding the very same economic policies that he once dismissed as "voodoo."

**4.** Although the CTU originally moved for release of its funds on the basis of its 1986–87 notice, subsequent refinements in the notice for the following school year have rendered the 1986–87 notice obsolete. Moreover, the CTU has agreed to refund all of plaintiffs' 1986–87 fair share payments. Due to these developments, the constitutionality of the 1986–87 notice has become a moot issue.

court. In the event that plaintiffs raise their fee objections under the CTU's revised fair share procedure,[5] the CTU will hold any disputed funds in escrow until an impartial decisionmaker evaluates plaintiffs' challenges. In light of the CTU's own provision for escrow, this court sees no reason to preserve the federal escrow currently in effect unless the CTU's notice has failed to provide potential objectors with sufficient information about the fee. Therefore, in the context of the CTU's motion to release, the court finds plaintiffs' objections to the fee's derivation largely irrelevant. By making these objections in this forum, plaintiffs are simply wasting their breath—and this court's time.

 This is not to say that plaintiffs have presented no pertinent arguments in opposition to the CTU's motion. In addition to questioning the CTU's calculation of the fee, plaintiffs make several attacks on the adequacy of the CTU's notice. Initially, they claim that the notice provides "subminimal" information about the fee. Despite this melodramatic characterization, plaintiffs can point to only two supposed deficiencies in the information supplied by the notice. First, plaintiffs note that the notice sets out no rationale for the CTU's choice of material factors and assumptions in calculating the fee. While plaintiffs might find this information helpful, the Supreme Court never indicated—and this court does not believe—that the Constitution requires the CTU to explain its rationale for making certain assumptions. Simply by disclosing these underlying assumptions, the CTU's notice is performing its proper constitutional function, enabling nonunion employees to assess the propriety of the fee. Plaintiffs also complain that the notice lacks detailed schedules breaking down activities and costs. The Supreme Court, however, has already concluded that "[t]he Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures." *Id.* at 307 n. 18, 106 S.Ct. at 1076 n. 18. Instead of mandating a notice filled with painstaking detail, the Constitution merely requires that a fair share notice "include the major categories of expenses." *Id.* The CTU's notice satisfies this constitutional requirement. Moreover, despite its failure to include detailed financial schedules or set forth the rationale behind every assumption, the CTU's notice is serving its intended purpose within the *Hudson* procedural framework. Ironically, plaintiffs' own challenges to the fee demonstrate that the notice is providing potential objectors with sufficient information to gauge the fee's propriety. Plaintiffs' impressive litany of fee objections betrays the absurdity of their claim that the notice supplies "subminimal" information.

 Plaintiffs also contend that the CTU did not subject its notice to adequate "verification by an independent auditor" in accordance with the Supreme Court's *Hudson* mandate. *Id.* They assert that the auditor who reviewed the notice should have verified the validity of the CTU's collective bargaining definitions instead of accepting those definitions without question. Under this interpretation of *Hudson*'s verification requirement, the auditor would usurp the impartial decisionmaker's function: determining which union expenses are properly chargeable to nonunion employees. In rejecting this interpretation of the auditor's responsibilities, the Second Circuit reasoned that the *Hudson* Court

**5.** As part of its internal objection procedure, the CTU has imposed a deadline for filing objections to the 1987–88 fair share fee. Technically, that deadline has passed. This court believes, however, that plaintiffs should receive an exemption from the deadline. After all, plaintiffs did not file timely objections with the CTU because they mistakenly believed that this court would redress their grievances. Although plaintiffs erred when they complained to this court about the fee's calculation, that error should not cost plaintiffs the opportunity for a hearing on their fee objections. These objections, which challenge the very foundation of the fee, should receive the attention of an impartial decisionmaker under the *Hudson* procedural scheme. For this reason, the court instructs the CTU to exempt plaintiffs from the 1987–88 objection deadline, thereby enabling plaintiffs to file their objections under the CTU's own procedure. Accordingly, the CTU shall offer plaintiffs a prompt opportunity to present their 1987–88 fee objections before an impartial decisionmaker.

envisioned a much more limited role for the auditor: *"Hudson's* auditor requirement is only designed to ensure that the usual function of an auditor is fulfilled. That usual function is to ensure that the expenditures which the union claims it made for certain expenses were actually made for those expenses." *Andrews v. Education Association of Cheshire,* 829 F.2d 335, 340 (2d Cir.1987). This court agrees with the Second Circuit's reading of *Hudson.* The Supreme Court could hardly have intended for an auditor to make difficult legal judgments concerning the appropriate allocation of expenses between collective bargaining and nongermane activities. Rather, verification under *Hudson* merely entails the performance of an auditor's typical function: attesting that a union actually spent its money in the manner represented by the fair share notice.

■ Given the limited role of the independent auditor, plaintiffs' only plausible challenges to the verification revolve around the CTU's distribution of its salary expenses between the chargeable and nonchargeable categories. To determine the proportion of its salary costs attributable to collective bargaining, the CTU requires all of its salaried employees to keep written reports of their job activities throughout the year. Based on these activity reports, each employee makes a year-end calculation of the percentage of his job that relates to collective bargaining. From these percentages, the CTU derives the proportion of its salary expenses that it incorporates into the fair share fee. According to plaintiffs, the auditor did not adequately verify the collective bargaining percentages calculated by individual CTU employees, the basis for the CTU's estimate of chargeable salary costs. Plaintiffs complain that the CTU did not promulgate uniform standards for completing the activity reports, creating the likelihood of idiosyncratic reporting by individual employees. Such discrepancies would cast doubt on an auditor's verification if his conclusions rested solely on an analysis of the activity reports. The auditor who verified the CTU's notice, however, looked beyond the activity reports. In assessing the reason-

ableness of an employee's collective bargaining percentage, the auditor compared the employee's expense reports with his activity reports, reviewed the employee's personal calendar, even interviewed the employee about the nature of his job. Deposition of Paul A. Merkel, April 22, 1988, at 43-62. This comprehensive approach to verification minimized the impact of any deviations in the activity reports of individual employees.

Plaintiffs also criticize the auditor for uncritically accepting the representations of CTU employees without asking whether those employees understood or applied the proper definition of collective bargaining. This criticism ignores the auditor's efforts to identify and investigate any questionable categorizations of job activities by CTU employees. The auditor has testified that whenever he discovered a potential inconsistency between an employee's classification of an activity and the CTU's definitional criteria, the auditor would interview the employee about the activity in question. After obtaining additional information through this interview, the auditor could then properly classify the activity as either chargeable or nonchargeable. *Id.* at 72-73. This procedure adequately ensured that CTU employees' descriptions of their job activities would comport with the definitions of collective bargaining contained in the fair share notice.

In their final challenge to the verification of salary expenses, plaintiffs suggest that the CTU should have required its employees to keep time reports of the hours they spent on various activities. Plaintiffs imply that without such time reports, the auditor could not have reliably verified the collective bargaining percentages calculated by CTU employees. Contrary to this assertion, plaintiffs' own accounting expert has testified that an adequate verification of these percentages need not include a review of time reports. If activity reports, expense records, and employee interviews reasonably substantiated an employee's collective bargaining percentage, the auditor would have no reason to seek additional information such as time reports. Deposi-

tion of Kenneth C. McKendree, June 1, 1988, at 40–42. Thus, in the process of verification, the decision not to seek time reports falls within the reasonable range of discretion accorded to an auditor. In the case of the CTU's 1987–88 notice, the auditor elected not to request time reports, having already found sufficient evidence to support the percentages calculated by CTU employees. This court is in no position to second-guess the auditor's professional judgment on this matter. Consequently, the court refuses to find that the auditor's failure to review time reports renders the CTU's notice constitutionally inadequate.[6]

 Finally, plaintiffs claim that the notice confuses potential objectors into thinking that the auditor has endorsed the CTU's definitions of collective bargaining. On the contrary, the notice includes the auditor's signed statement that his verification of the allocation of expenses was "subject to the definitions, material factors and assumptions" adopted by the CTU. From this statement, a reasonably intelligent person could discern that the auditor had applied the CTU's definitions without necessarily endorsing them. Plaintiffs also complain more generally that the notice does not explain the verification procedure in laymen's terms. This court recognizes that a detailed document like the CTU's notice inevitably breeds some confusion among readers untrained in economics or accounting. Nonetheless, having reviewed the notice, the court does not find the document unduly confusing or incomprehensible. Considering the fact that they are literate, intelligent educators, plaintiffs and their nonunion coworkers in the bargaining unit should have little or no difficulty in reading the notice and gaining an understanding of the basis for the fair share fee.

 Ultimately, plaintiffs' steady stream of pejorative rhetoric cannot ob-

scure the fact that the CTU's 1987–88 fair share notice represents a marked improvement over its original fair share scheme. In 1982, nonunion employees received only the most cursory "notice" of the CTU's fair share fee before the Board began deducting the fee from their paychecks. Without explaining how it calculated the fee, the CTU simply informed nonunion employees that their proportionate share of collective bargaining costs amounted to a certain percentage of union dues. In stark contrast, the CTU's 1987–88 notice discloses to nonunion employees the calculations and assumptions underlying the fair share fee. This notice includes all of the features required by the Supreme Court in *Hudson*. For instance, the notice breaks down the fee into its component parts, listing the CTU's major categories of expenses. The notice also reveals the CTU's method for calculating the fee, including the CTU's definition of collective bargaining. Furthermore, an independent auditor has verified that the CTU actually made the expenditures described in the notice. This verification incorporated the best format and the highest level of service offered by the accounting profession. Finally, and most importantly, the notice is serving its intended purpose within the *Hudson* procedural framework. Plaintiffs contend that their objections to the calculation of the fee illustrate the deficiency of the notice. On the contrary, these objections provide the best evidence that the notice is fulfilling its constitutionally appropriate role under *Hudson:* providing potential objectors with sufficient information to gauge the propriety of the fee. Taking all of these factors into consideration, this court concludes that the CTU has designed and promulgated a constitutionally adequate fair share notice. In light of this determination, the court sees no reason to maintain the federal escrow of the CTU's fair share funds.

---

**6.** Nonetheless, the court strongly encourages the CTU to institute a time reporting system for its employees. Although the auditor saw no need to consult time reports when he verified the 1987–88 notice, future audits may not go so smoothly. When examining the CTU's notice for a subsequent school year, the auditor may find that activity and expense reports and em-

ployee interviews do not satisfactorily answer all of his questions about a particular employee's collective bargaining percentage. Under those circumstances, the auditor may ask the CTU for supplemental information, including records of the time the employee spent on each activity. The CTU should be prepared for such a contingency.

## CONCLUSION

For the foregoing reasons, this court grants the CTU's motion to release the fair share funds held in escrow. The court instructs the Clerk of the Court to release these funds to the CTU, along with all interest accrued on the funds. In addition, by agreement of the parties, the court directs the CTU to give plaintiffs a refund of all their 1986–87 fair share contributions. Finally, this court orders the CTU to exempt plaintiffs from the deadline for filing fee objections under the CTU's internal appeal procedure. Pursuant to this procedure, plaintiffs shall receive a prompt opportunity to present their objections to the 1987–88 fee before an impartial decisionmaker. Pending resolution of the issues raised by plaintiffs, the CTU shall deposit all disputed fees in the escrow account it established as part of its internal objection procedure.

IT IS SO ORDERED.